DONALD W. FITZGERALD, State Bar No. 095348
THOMAS A WILLOUGHBY, State Bar No. 137597
JENNIFER E. NIEMANN, State Bar No. 142151
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
dfitzgerald@ffwplaw.com
twilloughby@ffwplaw.com
jniemann@ffwplaw.com

Proposed Attorneys for Zacky Farms, LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| In re:<br><br>ZACKY FARMS, LLC, a<br>California limited liability<br>company,<br><br>Debtor-In-Possession. | CASE NO. 12-37961-B-11<br><br>DCN: FWP-5<br><br>Date: October 11, 2012<br>Time: 1:30 p.m.<br>Courtroom: 32<br>501 I Street, 6th Floor<br>Sacramento, CA |
|---|---|

**DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO HONOR PREPETITION OBLIGATIONS TO GROWERS**

Zacky Farms, LLC, a California limited liability company, debtor in possession in the above-titled bankruptcy case ("Zacky Farms" or the "Debtor"), hereby files this Emergency Motion for Authority to Honor Prepetition Obligations to Growers (the "Motion"), and respectfully represents:

**JURISDICTION**

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 9014-1(f)(4). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are 11 U.S.C. §§ 363(b) and 105(a).

///

///

**REQUEST FOR RELIEF**

2.      By this Motion, the Debtor requests entry of an order that (i) authorizes but does not direct the Debtor, in its business judgment and sole discretion, to pay and honor all obligations that have accrued by virtue of the services rendered by the Growers (as defined below) pursuant to the Grower Arrangements (as defined below)) ("Growout Obligations") prior to the Petition Date in the ordinary course of business; and (ii) authorizes and directs the banks at which the Debtor maintains accounts to honor and pay all prepetition and postpetition checks issued or to be issued and fund transfers requested or to be requested, by the Debtor in respect of the Growout Obligations.  The Debtor also seeks authority to issue new postpetition checks or fund transfer requests with respect to prepetition obligations that may have been dishonored by the banks in connection with the Growout Obligations, if necessary.

3.      In support of this Motion, the Debtor relies upon the Declaration of Keith F. Cooper filed on October 9, 2012 (Dkt. No. 5) ("Cooper Decl.") filed herewith, along with all exhibits filed in support of that Declaration.  In further support of this Motion, the Debtor relies upon the following points and authorities:

**FACTUAL BACKGROUND**

4.      On October 8, 2012 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California.  The Debtor remains as debtor in possession pursuant to 11 U.S.C. §§1107 and 1108.  Cooper Decl. ¶ 8.

5.      The Debtor is currently engaged in the production, marketing, and distribution of a variety of fresh and frozen poultry products.  The Debtor's operations include the breeding, hatching, and growing of turkeys and chickens as well as processing and marketing of poultry products.  *Id.* ¶ 9.

6.      In addition to the poultry processing arm of its business, the Debtor, in the ordinary course of business, raises turkeys and chickens for slaughter.  Specifically, the Debtor delivers turkey poults and/or turkeys as well as chicken chicks to grow-out farms to be raised. At the turkey and chicken grow-out farms, the poults or chicks are raised for a varying number

of weeks depending upon the desired size of the bird. For turkeys, the poults are raised for approximately twelve to fourteen weeks for hens and up to eighteen weeks for tom turkeys. For chickens, the chicks are raised for approximately seven weeks. When the turkeys or chickens reach full growth, they are transported to processing plants. *Id.* ¶ 149.

7. In addition to the grow-out farms run by the Debtor, the Debtor also relies upon the services of approximately 10 independent contract growers, which are comprised of 8 turkey growers and 2 chicken growers (collectively, "Growers"), to raise and care for some of the Debtor's birds. The Debtor enters into contractual growing arrangements (the "Growing Arrangements") with individuals with whom they contract to raise and care for some of the Debtor's turkeys and chickens. As of the Petition Date, the Growers are in possession of approximately 300,000 of the Debtor's live turkeys and 97,000 of the Debtor's chickens, which are worth several million dollars. *Id.* ¶ 150.

8. The Growers are independent contractors. Pursuant to the typical Growing Arrangements, the Growers supply the farm, grow-out facilities, equipment, utilities and labor required to raise and care for the Debtor's birds, while the Debtor provides the live poultry as well as feed, vaccines, specific sanitation products, bedding material and medication which the Grower requires. In most if not all cases, the Growers are independent farmers who raise poultry solely for the Debtor. *Id.* ¶ 151.

9. The Debtor pays the Growers on two different timetables depending upon whether the Growers are raising chickens or turkeys. For the chicken Growers, the Grower receives one advance approximately three weeks after the last delivery of chicks for a scheduled placement. The Grower's final adjusted payment, due fifteen days after the last day of the week in which the flock is processed, is reduced by the amount of the advance. For the turkey Growers, the Grower receives two separate advances, an initial advance approximately two weeks after the last delivery of poults for a scheduled placement and a second advance approximately four weeks after the first advance. The Grower's final adjusted payment, due fifteen days after the last day of the week in which the flock is processed, is reduced by the amount of the advances. *Id.* ¶ 152.

10. Based on the proposed budget attached as Exhibit 6 to the Cooper Decl., the total amount projected to be paid to the Growers through year end is approximately $500,000. Of this amount, the Debtor estimates that the payments projected to be made to the Growers through the week ending November 30, 2012 relate to pre-petition claims of the Growers. The amount to be paid to the Growers according to the proposed budget through November 30 2012 is approximately $382,000.

## LEGAL ANALYSIS

11. As a result of the commencement of the Debtor's chapter 11 case, and in the absence of an order of the Court providing otherwise, the Debtor will be prohibited from paying or otherwise satisfying any pre-petition obligations regarding the Growout Obligations. It is critical to the Debtor's business that its live chickens and turkeys receive proper care. If the Growers stop caring for the Debtor's birds, the Debtor's inventories would be diminished for months. The Debtor would be unable to meet customer expectations and its customers would quickly find alternative suppliers. Once a customer switches to a competitor, the Debtor may not regain that customer's business for an extended period of time, if at all. In addition, many of the Debtor's major customers regularly audit the Debtor for its compliance with industry standards for animal welfare. Any interruption in proper care of the Debtor's birds by the Growers as well as any publicity generated by such interruption could endanger important relationships with the Debtor's customers. Cooper Decl. ¶ 153.

12. A failure to pay the Growers may result in an inability or unwillingness of the Growers to care for the Debtor's birds that are currently in such Growers' possession. Most, if not all, of the Growers with claims against the Debtors arising from prepetition services continue to be in possession of the Debtor's birds post-petition. In addition, if the Growers terminate or suspend their services, the Debtor could not find replacement growers in a reasonable time because the current Growers' farms are properly equipped to raise and care for the Debtor's birds. At this point it would not be feasible to enlist the assistance of other growers. *Id*. ¶ 154.

///

///

**A. The Debtor May Be Compelled to Pay the Poultry Producers Pursuant to Poultry Producers Financial Protection Act of 1987, an Amendment to the Packers and Stockyards Act of 1921**

13. The Debtor may be compelled under applicable statutes to pay outstanding prepetition amounts owed to the Growers. Because the Growers supply live birds in their care to the Debtor for slaughter, the Debtor may be required by statute to pay the Growers promptly for their services. Specifically, the Poultry Producers Financial Protection Act of 1987, an amendment to the Packers and Stockyards Act of 1921 ("PSA"), provides that:

> [E]ach live poultry dealer obtaining live poultry under a poultry growing arrangement shall, before the close of the fifteenth day following the week in which the poultry is slaughtered, deliver, to the . . . poultry grower from whom such live poultry dealer obtains the poultry, the full amount due to such . . . poultry grower on account of such poultry.

7 U.S.C. § 228b-1(a). Moreover, the statute further provides that:

> Any delay or attempt to delay, by a live poultry dealer which is a party to any such transaction, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for poultry obtained by poultry growing arrangement . . . shall be considered an "unfair practice" in violation of this Act.

7 U.S.C. § 228b-1(b). Violations of the PSA expose "live poultry dealer[s]" to potential civil penalties in the amount of up to $20,000 per violation. 7 U.S.C. § 228b-2. Moreover, the United States Department of Agriculture (the "USDA"), the agency charged with enforcing the PSA, is empowered to seek an injunction or temporary restraining order to enjoin the operations of any person who "has failed to pay any poultry grower what is due on account of poultry obtained under a poultry growing arrangement," if it would be in the public interest to do so. 7 U.S.C § 228a.

14. Not only does the PSA protect poultry growers by subjecting poultry dealers to penalties and a potential shutdown of operations if poultry growers are not paid, but the PSA creates an additional protection of poultry growers by establishing a statutory trust. Section 197 of the PSA provides that:

> All poultry obtained by a live poultry dealer, . . . by poultry growing arrangement, and all inventories of, or receivables or proceeds from such poultry or poultry products derive therefrom, shall be held by such live poultry dealer in trust for the benefit of all unpaid . . . poultry growers of such poultry, until full payment has been received by such unpaid . . . poultry growers . . .

7 U.S.C. § 197(b).

15. The purpose of the provisions of the Poultry Producers Financial Protection Act of 1987 relating to prompt payment and statutory trust "are designed to ensure that those engaged in poultry production are protected from circumstances that could inflict heavy losses on an extremely important segment of our nation's agricultural community." H.R. Rep. No. 100-397, at 6 (1987), *reprinted* in 1987 U.S.C.C.A.N. 855, 856. The 1987 amendment revised the PSA to regulate not only those purchasing poultry from poultry growers but also those engaged in "poultry growing arrangements" under which "the owner of live poultry contracts with a grower to raise the poultry, and the grower receives a fee for services rendered." *Id*. Thus, the amendment to the PSA was intended to "bring it in line with contemporary business practices" in the poultry industry. *Id*.

16. The PSA intended, in part, to ensure financial protection for poultry growers in the event of any bankruptcy by the poultry owner or purchaser. The cases construing section 499e of the Perishable Agricultural Commodities Act ("PACA"), a statute virtually identical in effect to section 197 of the PSA in that it imposes a statutory trust in favor of fruit and vegetable producers, consistently hold that PACA trust assets are <u>not</u> "property of the estate" pursuant to section 541 of the Bankruptcy Code. *See, e.g., In re Fresh Approach, Inc.*, 48 B.R. 926, 931 (Bankr. N.D. Tex. 1985) ("[T]he Court acknowledges the position of the Secretary that 'if a buyer or receiver declares bankruptcy . . . trust assets are not to be considered part of the estate to be distributed to other creditors or sold unless all trust beneficiaries have been paid.'"). Therefore, the distribution of assets to beneficiaries of a PACA statutory trust (or a PSA statutory trust) falls outside of both (i) the priority scheme established by the Bankruptcy Code, and (ii) the plan process (*i.e.*, trust beneficiaries may be paid outside of, and prior to, a confirmed plan of reorganization). Thus, pursuant to the PSA, when a "live poultry dealer" files for bankruptcy, any poultry, or any products or proceeds derived therefrom, obtained from an unpaid "poultry grower" that has complied with the statutory notification requirements for preservation of the benefits of the PSA trust, *see* 7 U.S.C. § 197(d), is not property of the

debtor's estate.[1]

17.     Failure by the Debtor to pay the Growers would be subject to enforcement by the USDA of by a court of the PSA's penalty provisions and to the PSA statutory trust because the Debtor is a "live poultry dealer" within the meaning of that statute.  Section 182(10) defines a "live poultry dealer" as "any person engaged in the business of obtaining live poultry . . . under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another."[2]  The Debtor obtains live poultry for the purpose of slaughter or sale from the Growers through the Growing Arrangements.  The Growers, as independent contractors who raise and care for the Debtor's birds for the purpose of slaughter, are "poultry growers" within the meaning of the PSA because they are "persons engaged in the business of raising and caring for live poultry for slaughter by another, whether the poultry is owned by such person or by another, but not an employee of the owner of such poultry."  7 U.S.C. § 182(8).  The term "growing arrangement" includes the Debtor's Growing Arrangements with the Growers as the PSA defines this term.  The PSA provides that a "growing arrangement is "any growout contract, marketing agreement, or other arrangement under which a poultry grower raises and cares for live poultry for delivery, in accord with another's instructions, for slaughter." 7 U.S.C. § 182(9).  Thus, the Debtor's transactions with the Growers is subject to the PSA, and the Debtor is statutorily required to make prompt payments to the Growers or risk being enjoined from operating or being subjected to civil penalties.  Moreover, any poultry obtained by the Debtor from the Growers, or any inventories of or accounts receivable related to such poultry or products derived therefrom is deemed held in trust by the Debtor until the Growers are paid, and is not property of the Debtor's estate.

---

[1] The trust is preserved by providing "written notice to the live poultry dealer and by filing such notice" with the USDA within 30 days after the payment is due under 7 U.S.C. § 228b-1 or 15 days after a payment instrument has been dishonored.  7 U.S.C. § 197(d).  The events which trigger the statutory notification procedure have not yet occurred in this case.

[2] The statute additionally requires that one of three jurisdictional prerequisites also exists, namely that (1) the "poultry is obtained by such person in commerce," (2) "poultry obtained by such person is sold or shipped in commerce," or (3) "poultry products from poultry obtained by such person are sold or shipped in commerce."  7 U.S.C. § 182(10).  The Debtor satisfies the second and third jurisdictional prerequisites because it sells and ships either poultry or poultry products in commerce.

18. For the above reasons, therefore, it is imperative that the Debtor be authorized to pay all Growout Obligations to ensure the uninterrupted operation of the Debtor's business.

**B.      Immediate Payment of PrePetition Growout Obligations is Necessary and is Authorized by 11 U.S.C. §§ 363(b) and 105(a)**

19. The Debtor may use property of the estate to continue its operations under section 363(b). Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. §363(b)(1). Section 363(c)(1) allows the Debtor to use property of the estate in the ordinary course of business without court approval. Furthermore, courts recognize that a debtor-in-possession has a fiduciary duty to, among other things, protect and preserve the bankruptcy estate, including preserving an operating business' going concern value. *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

20. Pursuant to section 105(a), courts have invoked the "necessity of payment" doctrine[3] to authorize the immediate payment of a debtor's prepetition obligations to unsecured creditors before plan confirmation when such payment is essential to the continued operation of the debtor in a Chapter 11 reorganization. *See In re Columbia Gas Systems, Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (to justify payment of one class of pre-petition creditors in advance of a confirmed plan, the debtor must show that payment is essential to the continued operation of the business); *In re Penn Central Transp. Co.*, 467 F.2d 100, 102 and n.1 (3d Cir. 1972) (pre-Code case recognizing "necessity of payment" cases permitting immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid).

21. The Ninth Circuit has recognized the "necessity of payment" doctrine. In *Burchinol v. Central Washington Bank (In re Adam's Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir, 1987), the Ninth Circuit discussed the existence of two competing "fundamental tenets" of bankruptcy: (1) equality in the treatment of all creditors; and (2) the rehabilitation of Debtor.

---

[3] Alternatively called the "necessity of payment" rule.

The court stated that the rehabilitation of a debtor "may supersede the policy of equal treatment" of creditors, and went on to describe such situations, specifically mentioning the payment of pre-petition wages and benefits to employees. *Id.* ("Cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.").[4] Furthermore, the court went on to state that section 364(d), for example, "illustrates a Congressional willingness to subordinate the interests of pre-petition creditors to the goal of rehabilitation." *Id.*

22.   With respect to the accrued and unpaid Growout Obligations, the Debtor requests that, to the extent practicable, the applicable banks be directed to honor checks or fund transfer requests regardless of whether they were issued prior to or after the Petition Date. The Debtor has or will have on deposit sufficient funds in its disbursement account to satisfy all Growout Obligations so that the banks will not be prejudiced by an order directing them to honor the Debtor's checks or fund transfer requests with respect to such amounts.

23.   Finally, authorization of the payment of the prepetition Growout Obligations shall not be deemed to constitute postpetition assumption or adoption of any policy, plan, program or employee agreement pursuant to section 365 of the Bankruptcy Code. The Debtor is in the process of reviewing these matters and reserving all of their rights under the Bankruptcy Code with respect thereto.

24.   The Debtor seeks to avail itself of the protection and flexibility provided by the bankruptcy laws to reorganize and address the financial crisis that has befallen the Debtor. Wherefore, the Debtor seeks this Court's permission to honor its prepetition Growout Obligations in order to insure that the Debtor's live birds are cared for properly and to prevent harm to the Debtor's business, and to implement a seamless transition into Chapter 11.

---

[4]   See also *In re Ionosphere Clubs, Inc.*, *supra*, at 176 ("The policy of equality among creditors… may be of significance in liquidation cases under Chapter 7, however, the paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor.")

**C. The Payment of Pre-Petition Growout Obligations is Necessary Under Federal Rule of Bankruptcy Procedure 6003**

25. Pursuant to the recently revised Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. As described above, the Growers are integral to the Debtor's operations. Failure to satisfy the Growout Obligations in the ordinary course of business during the first 21 days of this chapter 11 case will jeopardize their loyalty and trust, causing the Growers to care for the Debtor's live birds properly and severely disrupting the Debtor's operations at this critical juncture, as well as affecting the Debtor's going concern value. Accordingly, the Debtor submits that it has satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of its Growout Obligations.

## NOTICE

26. No trustee, examiner or creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been provided by e-mail, fax or overnight courier to the following parties in interest: (a) the Office of the United States Trustee, (b) the twenty (20) largest unsecured creditors of the Debtor (as identified in the lists filed pursuant to Bankruptcy Rule 1007(d), (c) secured creditors, and (d) all parties who have filed notices of appearance in these cases. As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served as required by Rule 9014-1(f)(4) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of California. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this Motion is required.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Debtor respectfully request entry of an order as follows:

///

1. Authorizing, but not directing, the Debtor to pay and honor all Growout Obligations incurred prior to the Petition Date;

2. Authorizing and directing the bank at which the Debtor maintains an account from which the Debtor's Growout Obligations are disbursed and all other banks or lending institutions maintaining Growout Obligations accounts to honor and pay all pre-petition and post-petition checks issued or to be issued and fund transfers requested or to be requested, by the Debtor in respect of the Growout Obligations;

3. Authorizing the Debtor to issue new post-petition checks or fund transfer requests with respect to pre-petition obligations that may have been dishonored by the banks in respect of the Growout Obligations, if necessary; and

4. For such other and further relief as the Court deems just.

Dated: October 9, 2012

                              FELDERSTEIN FITZGERALD
                              WILLOUGHBY & PASCUZZI LLP

                              By: */s/ Thomas A. Willoughby*
                                  Thomas A. Willoughby
                                  Proposed Attorneys for Zacky Farms, LLC,
                                  Debtor and Debtor in Possession