DONALD W. FITZGERALD, State Bar No. 095348
THOMAS A WILLOUGHBY, State Bar No. 137597
JENNIFER E. NIEMANN, State Bar No. 142151
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
dfitzgerald@ffwplaw.com
twilloughby@ffwplaw.com
jniemann@ffwplaw.com

Proposed Attorneys for Zacky Farms, LLC

## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

#### SACRAMENTO DIVISION

| In re: | CASE NO. 12-37961-B-11 |
|---|---|
| ZACKY FARMS, LLC, a California limited liability company, | DCN: FWP-1 |
| | Date: October 11, 2012 |
| | Time: 1:30 p.m. |
| Debtor-In-Possession. | Courtroom: 32 |
| | 501 I Street, 6th Floor |
| | Sacramento, CA |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§105, 361, 362, 363, 364, AND 507 (I) AUTHORIZING DEBTOR (A) TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING INTERIM AND FINAL HEARINGS**

**NOTICE IS HEREBY GIVEN THAT THE DEBTOR IS REQUESTING THAT THE NEW DIP FACILITY LIENS BE SENIOR TO AND PRIME THE FOLLOWING LIENS: (A) ORIGINAL CREDIT FACILITY (AS DEFINED HEREIN) LIENS; AND TO THE EXTENT THEY EXISIT (B) THE LIENS OF WESTERN MILLING LLC; (C) ANY UNRECORDED LIENS ON PRE-PETITION ASSETS; (D) PRE-PETITION CONTRACT GROWER LIENS; AND (E) ANY PARTIES WHO MAY HOLD PRE-PETITION SECURED SET-OFF RIGHTS**

**TABLE OF CONTENTS**

JURISDICTION...............................................................................................................4

RELIEF REQUESTED ....................................................................................................4

BACKGROUND ...............................................................................................................5

    Overview ...................................................................................................................5

    Prepetition Efforts to Avoid Bankruptcy..............................................................6

    The Debtor's Pre-Petition Credit Facility ............................................................8

    Brief Summary of the Debtor's Assets ................................................................11

    Unsecured Claims .................................................................................................11

    Other Secured Claims ..........................................................................................12

    Other Potential Claims ........................................................................................12

EMERGENCY NEED .....................................................................................................12

SUMMARY OF PROPOSED DIP FACILITY AND TERMS....................................14

    DIP Facility Provisions that Potentially Implicate the Guidelines .............................15

POTENTIAL ALTERNATIVE LENDERS ..................................................................20

APPLICABLE AUTHORITY ........................................................................................21

    Approval of DIP Facility and Senior Liens.........................................................21

    The Requested Priming Lien Is Reasonable in the Circumstances of this Case ........23

    Approval of Use of Cash Collateral to Pay Original Credit Facility.........................24

    Modification of the Automatic Stay ....................................................................25

    Interim Approval of the DIP Credit Facility .......................................................25

CONCLUSION................................................................................................................26

1

<b><u>TABLE OF AUTHORITIES</u></b>

2

<u>**CASES**</u>

3

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................... 21

4

*In re Berry Good, LLC,* 400 B.R. 741 (Bankr. D. Ariz. 2008) ...................................................... 21

5

*In re Defender Drug Stores*, 145 B.R. 312 (9th Cir. BAP 1992) ................................................... 21

6

<u>**STATUTES**</u>

7

11 U.S.C. §§ 101-1532 ................................................................................................................... 1

8

11 U.S.C. §105(a) ....................................................................................................................... 1, 2

9

11 U.S.C. §361 ............................................................................................................................ 1, 2

10

11 U.S.C. § 362 ..................................................................................................................... 1, 2, 23

11

11 U.S.C. § 363 ..................................................................................................................... 1, 2, 23

12

11 U.S.C. § 363(c)(2) ............................................................................................................... 22, 23

13

11 U.S.C. § 364 .............................................................................................................. 1, 2, 21, 23

14

11 U.S.C. § 364(c) ......................................................................................................................... 19

15

11 U.S.C. § 364(d) ......................................................................................................................... 20

16

11 U.S.C. § 364(d)(1) ..................................................................................................................... 20

17

11 U.S.C. §§ 501-562 ..................................................................................................................... 17

18

11 U.S.C. § 503(b) ......................................................................................................................... 19

19

11 U.S.C. § 503(b)(1) ..................................................................................................................... 19

20

11 U.S.C. § 506(c) ..................................................................................................................... 2, 15

21

11 U.S.C. § 507 ........................................................................................................................... 1, 2

22

11 U.S.C. § 507(b) ......................................................................................................................... 19

23

11 U.S.C. § 552 ............................................................................................................................... 3

24

11 U.S.C. § 1107 ............................................................................................................................. 3

25

11 U.S.C. § 1108 ............................................................................................................................. 3

26

28 U.S.C. § 157 ............................................................................................................................... 2

27

28 U.S.C. § 157(b) ........................................................................................................................... 2

28

28 U.S.C. § 1334 ................................................................................................................. 2

28 U.S.C. § 1408 ................................................................................................................. 2

28 U.S.C. § 1409 ................................................................................................................. 2

**RULES**

Fed. Bankr. Proc. Rule 1007(d) ........................................................................................ 20

Fed. Bankr. Proc. Rule 1102 ............................................................................................. 20

Fed. Bankr. Proc. Rule 2002 ............................................................................................... 1

Fed. Bankr. Proc. Rule 4001 ............................................................................................... 1

Fed. Bankr. Proc. Rule 4001(b)-(c) ................................................................................... 23

Fed. Bankr. Proc. Rule 4001(c)(2) .................................................................................... 20

Fed. Bankr. Proc. Rule 4001(d) ........................................................................................ 20

Fed. Bankr. Proc. Rule 4001(d)(1)-(2) ............................................................................. 20

Fed. Bankr. Proc. Rule 8002 ............................................................................................... 1

Fed. Bankr. Proc. Rule 9014 ............................................................................................... 1

Local Rules of Practice for the United States Bankruptcy Court, Eastern District of
    California ....................................................................................................................... 1

Local Rule 4001-1(c)(3)(A) .............................................................................................. 13

Local Rule 4001-1(c)(3)(B) .............................................................................................. 14

Local Rule 4001-1(c)(3)(C) .............................................................................................. 15

Local Rule 4001-1(c)(3)(D) .............................................................................................. 15

Local Rule 4001-1(c)(3)(E) .............................................................................................. 15

Local Rule 4001-1(c)(3)(F) .............................................................................................. 15

Local Rule 4001-1(c)(3)(G) .............................................................................................. 16

Local Rule 4001-1(c)(3)(H) .............................................................................................. 16

Local Rule 4001-1(c)(3)(I) ............................................................................................... 17

Local Rule 4001-1(c)(3)(J) ............................................................................................... 17

Local Rule 4001-1(c)(3)(K) .............................................................................................. 17

Local Rule 4001-1(c)(3)(L) .............................................................................................. 17

DEBTOR'S MOTION TO APPROVE DIP FINANCING AND
AUTHORIZE USE OF CASH COLLATERAL

1    Zacky Farms, LLC, a California limited liability company ("Zacky Farms" or the

2    "Company"), debtor and debtor in possession (the "Debtor"), hereby submits this motion (the

3    "Motion") for entry of an interim order substantially in the form attached as Exhibit A to the

4    Exhibit document filed on October 9, 2012 (Dkt. No. 11) to the Omnibus Notice of Emergency

5    Hearings on Debtor's First Day Motions (the "Proposed Interim Order") and a final order (the

6    "Final Order" and, together with the Proposed Interim Order, the "Orders"), under sections

7    105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532

8    (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

9    Procedure (the "Bankruptcy Rules"), and the Local Rules of Practice for the United States

10   Bankruptcy Court, Eastern District of California (the "Local Rules").

11   The Proposed Orders (I) authorize the Debtor (A) to enter into a financing arrangement as

12   provided for in that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and

13   Security Agreement dated as of October 8, 2012, by and between the Debtor and the Robert D.

14   Zacky and Lillian D. Zacky Trust U/D/T Dated July 26, 1988 (the "Robert D. and Lillian D.

15   Zacky Trust"), substantially in the form attached to the Exhibit Document as Exhibit 7 (as

16   amended, modified, and in effect from time to time, and together with any and all other related

17   documents and agreements entered into in connection with or related to the same, including,

18   without limitation, any fee letters, hereafter collectively hereafter referred to as the "DIP

19   Facility"), and (B) to use Cash Collateral (as defined below); (II) grant liens including priming

20   liens and providing superpriority administrative expense status; (III) grant "adequate protection"

21   to the Prepetition Secured Parties (as defined below); (IV) modify the automatic stay; and (V)

22   schedule interim and final hearings with respect to the relief requested in this motion. In support

23   of the Motion, the Debtor relies upon and incorporates by reference the Declaration of Keith F.

24   Cooper in Support of Application for an Order Shortening Time and in Support of First Day

25   Motions (the "Cooper Declaration"),[1] filed on October 9, 2012 (Dkt. No. 5). In support of the

26

27   _____

28   [1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the
     Interim Order or the DIP Credit Agreement.  To the extent that there is any conflict between this
     Motion and the Interim Order, the Interim Order shall control.

Motion, the Debtor respectfully represents:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b).  The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, 364, and 507.

## RELIEF REQUESTED

2.      By this Motion, the Debtor seeks entry of the Interim and Final Orders containing the following relief:[2]

(a)     Authorization to obtain DIP Financing as described in paragraph 2 of the proposed Interim Order.

(b)     Authorization to grant Superpriority Claims as described in paragraph 3 of the proposed Interim Order.

(c)     Authorization to grant senior and priming DIP Liens on previously encumbered and unencumbered property of the estate as described in paragraph 4 of the proposed Interim Order.

(d)     Authorization to grant adequate protection of DIP Lender's rights as described in paragraph 5 of the proposed Interim Order.

(e)     Approval of the Events of Default during the interim approval period as described in paragraph 6 and 7 of the proposed Interim Order.

(f)     Approval of a limitation on charging expenses under section 506(c) of the Bankruptcy Code as described in paragraph 8 of the proposed Interim Order.

(g)     Authorization to use cash collateral subject to the liens of the Original Credit Facility as described in paragraph 9 of the proposed Interim Order.

(h)     Authorization to grant adequate protection for the use of cash collateral to the Robert D. and Lillian D. Zacky Trust for the use of cash collateral subject to the liens of the Original Credit Facility as described in paragraph 10 of the proposed Interim Order;

(i)     Approval of a provision in the Interim Order that compels the Debtor to comply with the Original Credit Facility in all material respects other than as modified herein or as prohibited by the Bankruptcy Code.

(j)     Approval of a carve out for professionals as described in paragraph 12 of the proposed Interim Order.

---

[2]  Payments made pursuant to the First Day Orders are subject to the terms of the Interim Order and the DIP Credit Agreement.

(k) Approval of a release of all claims against the Robert D. and Lillian D. Zacky Trust as described in paragraph 13 of the proposed Interim Order, which release is subject to a review period contained in paragraph 25 of the proposed Interim Order.

(l) Approval of an indemnification of the Robert D. and Lillian D. Zacky Trust as described in paragraph 14 of the proposed Interim Order.

(m) Authorization to grant the Robert D. and Lillian D. Zacky Trust the benefits of section 552 of the Bankruptcy Code as described in paragraph 16 of the proposed Interim Order.

(n) Approval of a limitation on the Debtor's use of the DIP Facility proceeds and cash collateral as described in paragraph 24 of the proposed Interim Order.

(o) Approval of the binding effect of each stipulation, acknowledgement and release contained in the proposed Interim Order except to the extent that a party in interest challenges such stipulation, acknowledgement and release as described in paragraph 25 of the proposed Interim Order.

(p) Approval of multiple provisions respecting cash management, collateral rights, credit bid rights, reservation of rights of the prepetition secured lender, no waiver provisions, automatic perfection provisions, preservation of rights granted under the proposed Interim Order, effect of conflict between documents and the proposed Interim Order, binding effect and successors and assigns, the final hearing and notice, retention of jurisdiction, rules of construction and waiver of requirements to file proofs of claim all as described in paragraphs 15, 17-23, and 26-32 of the proposed Interim Order.

## **BACKGROUND**

3. On October 8, 2012 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California. The Debtor remains as debtor in possession pursuant to 11 U.S.C. §§1107 and 1108. Cooper Declaration ¶ 8.

4. The Debtor is currently engaged in the production, marketing, and distribution of a variety of fresh and frozen poultry products. The Company's operations include the breeding, hatching, and growing of turkeys and chickens as well as processing and marketing of poultry products. *Id.* ¶ 9.

**Overview**

5. The Company was founded in 1928 with the opening of Sam's Poultry Market in Los Angeles. Over the next 84 years, the Company expanded to become one of the largest

vertically integrated poultry processors in the United States.[3]  *Id.* ¶¶ 10-17.

6.    The Company's major stockholders include the proposed DIP Facility lender, the Robert D. Zacky and Lillian D. Zacky Trust  (50%); as well as Richard Zacky, Trustee of the Richard N. Zacky Irrevocable Trust dated 11/25/07 (16.605%); Richard N. Zacky, Trustee of the Barbara Jean Zacky Irrevocable Trust dated 12/30/06 (16.605%); Sharon Zacky Wilensky, Trustee of the Sharon Zacky Wilensky Irrevocable Trust dated 11/26/07 (16.605%); Richard N. Zacky, Trustee of Trust A of the Albert and Beverly Zacky Trust (.06%); and Richard N. Zacky, Trustee of Trust B of the Albert and Beverly Zacky Trust (.06%).

7.    The Company's gross sales were $142 million in 2010 and $146 million in 2011. *Id.* ¶ 20.

8.    The Company has approximately 1,000 employees and operates in multiple plants, farms and offices in California, including operations in Los Angeles, Fresno, Tulare, Kings, San Joaquin and San Bernardino Counties.  *Id.* ¶ 19.

**Prepetition Efforts to Avoid Bankruptcy**

9.    One of the crucial problems facing the Debtor is the recent volatility in the price for corn and other commodities, which has seriously impacted Zacky Farms' liquidity position.

10.    Profitability in the poultry industry is materially affected by the commodity prices of feed ingredients.  The cost of corn and soybean meal, the Debtor's primary feed ingredients, increased significantly in early 2008 as a result of, among other things, increasing demand for these products because of the passage of the Energy Independence and Security Act of 2007 ("EISA").  The EISA established annual minimum requirements for an increase in the production of biofuels, including ethanol (which is primarily made from corn), from nine billion gallons in 2008 to sixteen billion gallons by 2022.  As a result, the demand for, and price of, corn increased significantly.  Prior to the EISA, the price of corn ranged from between $2.00 and $3.25 per bushel.  After EISA, corn prices reached a high of $7.65 per bushel in June 2008, and then dropped to approximately $3.50 per bushel on average for 2009 and increased to an average of

---

[3] A more detailed description of the facts and circumstances leading up to the Petition Date and providing the background of the Debtor is set forth in the Cooper Declaration.

approximately $6.25 per bushel in 2011.  *Id.* ¶ 22.

11.     Recently, a severe drought exacerbated the situation and corn prices increased to between $7.00 and $8.00 per bushel for most of 2012, with the current price at $7.50 per bushel. *Id.* ¶ 23.

12.     In addition to the rise in corn prices, the price of soybean meal has risen from approximately $300 per ton on average in 2010 and 2011 to a current price of approximately $500 per ton.  *Id.* ¶ 24.

13.     The liquidity crisis has also been impacted by the seasonal nature of turkey sales. The great bulk of turkey sales occur around the Thanksgiving holiday period.   Vertically integrated turkey growers require a significantly greater amount of cash for the feed and care of the birds grown to meet consumer demands for the Thanksgiving holiday.  *Id.* ¶ 25.

14.     Zacky Farms is currently expending approximately $1.8 million per week on feed for its approximately 1.9 million turkeys and 600,000 chickens.  *Id.* ¶ 26.

15.     Zacky Farms first addressed this cash flow crisis by obtaining stop gap financing from two family trusts which in aggregate own approximately 67% of Zacky Farms.  *Id.* ¶ 27.

16.     Between April 2012 and the present, the Robert D. and Lillian D. Zacky Trust, which owns 50% of Zacky Farms and the Lillian D. Zacky Trust dated July 26, 1988 (the "Lillian D. Zacky Trust"), have advanced $7 million as short-term loans to Zacky Farms.  An initial $3 million was advanced on April 25, 2012, and another $1 million was advanced on May 18, 2012. Both of these advances were on an unsecured basis.  The Lillian D. Zacky Trust advanced $500,000 on September 7, 2012; another $500,000 on September 17, 2012, and then $2 million on September 28, 2012.  The loans made in September 2012 were secured by real estate collateral owned by Zacky Farms (the "Bridge Liens").  *Id.* ¶ 28.

17.     Between September 7, 2012 and the present, the Richard N. Zacky Irrevocable Trust dated November 25, 2007, which owns 16.605833% of Zacky Farms, advanced the sum of $500,000 on September 7, 2012 and another $500,000 on September 17, 2012.  Both loans were secured by real estate collateral owned by Zacky Farms (collectively, with the Bridge Liens, the "Prepetition Bridge Liens").  *Id.* ¶ 29.

18.     Unfortunately, the foregoing described owner loans have been insufficient in fully bridging the cash flow gap until the Thanksgiving sales produce a positive cash flow.  *Id.* ¶ 30.

19.     Concurrent with the liquidity crisis, the Zacky families were negotiating reciprocal buyouts whereby certain members of the extended family of Robert Zacky (deceased) would buy out the 50% interest in Zacky Farms owned by the extended family of Albert Zacky (deceased), and correspondingly certain members of the extended family of Albert Zacky would buy out the 50% interest of Integrated Grain and Milling, Inc. ("IGM") owned by the extended family of Robert Zacky.  On or about September 8, 2012, the owners of the Debtor executed an amendment to the Zacky Farms operating agreement that approved the appointment of Keith Cooper as the sole manager and the CRO in the event that a buyout had not been completed by September 18, 2012.  *Id.* ¶ 31.

20.     As the cash crisis deepened, and with no buyout agreement among the family ownership groups, it became impossible to obtain additional financing from either side of the Zacky family.  The Robert D. and Lillian D. Zacky Trust will, however, extend additional secured bridge financing on the terms and conditions of the DIP Facility Credit Agreement (as defined below) if it is able to obtain all the protections of a DIP financing order.  *Id.* ¶ 32.

21.     FTI began its onsite review of the business operations on September 18, 2012.  *Id.* ¶ 33.

22.     FTI's work to date mainly focused on the Company's dire liquidity situation.  FTI assisted Management in the development of a detailed 13-week cash flow to determine the cash needs of the Company through the end of 2012.  Additionally, FTI had held initial discussions with Senior Management and the Sales organization to begin an assessment of potential strategic alternatives and restructuring opportunities.  Finally, FTI assisted the Company in seeking financing alternatives and eventually the preparation of its chapter 11 bankruptcy filing.  *Id.* ¶ 34.

**The Debtor's Pre-Petition Credit Facility**

23.     On or about October 13, 2009, Zacky Farms entered into a revolving credit facility with Wells Fargo Bank, N.A. ("Wells Fargo") in the amount of $55 million that included a continuing security agreement in inventory and equipment, and a third party security agreement

(the "Original Credit Facility").  *See* Closing Documents 2009 Credit Agreement, attached as Exhibit 1.[4]  *Id.* ¶ 35.

24.    The Robert D. and Lillian D. Zacky Trust was a surety for the Original Credit Facility and pledged collateral for the Original Credit Facility under the terms of the third party security agreement.  *Id.* ¶ 36 and Exhibit 1 Tab 5 to Cooper Declaration.

25.    Wells Fargo perfected its security interest in assets of Zacky Farms by recording a UCC-1 financing statement on November 17, 2009 (the "Wells Fargo Lien").  *See* Certified UCC Search Zacky Farms, LLC attached as Exhibit 2, which includes the Wells Fargo UCC-1 financing statement (the "Wells Fargo UCC-1").  Cooper Declaration ¶ 37.

26.    In box 4 of the Wells Fargo UCC-1, the following collateral was identified:

> All accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivables and other rights to payment of every kind now or at any time hereafter arising out of the business of Debtor, and all goods returned by or repossessed from Debtor's customers.  All inventory, raw materials, component parts and embedded software, work in process and/or materials now or at any time hereafter used or consumed in Debtor's business, and all warehouse receipts, bills of lading and other documents evidencing goods now owned or hereafter acquired by Debtor, and all goods covered thereby, including all accessions, additions and improvements thereto and products thereof, wherever located, whether in the possession of Debtor or any warehouseman, bailee or any other person, or in process of delivery.  All goods, tools, machinery, furnishings, furniture and other equipment of Debtor now owned or hereafter acquired, wherever located, whether in the possession of Debtor or any other person, and all improvements, replacements, accessions and additions thereto and embedded software included therein.  All proceeds of any of the foregoing, including without limitation, all rights to payment with respect to any insurance, including returned premiums, or any claim or cause of action relating to any of the foregoing.

*Id.* ¶ 38.

27.    Subsequent to the extension of the Original Credit Facility in July, 2011, Zacky Farms obtained additional financing in the amount of $6 million, increasing the total facility with Wells Fargo to $61 million.  *See* Revolving Line of Credit Note, and associated documents including amendments 1-4 attached as Exhibit 3.  *Id.* ¶ 39.

28.    The Wells Fargo indebtedness was extended and modified in various amendments,

---

[4]  All references to "attached" exhibits refer to those documents attached to the separately filed Exhibit Document, filed on October 9, 2012 (Dkt. No. 8).

which extended the facility deadline through July 15, 2012.  *Id.* ¶ 40.

29.     The Wells Fargo obligations under the Original Credit Facility and as expanded and extended became fully due and payable on July 15, 2012.  *Id.* ¶ 42.

30.     Wells Fargo served a notice of default letter to Zacky Farms on October 3, 2012 demanding payment in full of the Wells Fargo indebtedness.  *Id.* ¶ 43.

31.     On or about the week of October 3, 2012, the Robert D. and Lillian D. Zacky Trust negotiated to purchase the Original Credit Facility from Wells Fargo.  *Id.* ¶ 44.

32.     As part of these negotiations, the Debtor requested that the Robert D. and Lillian D. Zacky Trust not interfere with the continued validity of a standby letter of credit NZS649104 in favor of Self Insurance Plans State of California in the amount of $4,527,562.00 (the "Workers' Compensation Letter of Credit").  *Id.* ¶ 45.

33.     As described in the Cooper Declaration, the Debtor self-funds its workers' compensation plan at a significant cost savings, and the maintenance of the Workers' Compensation Letter of Credit is a requirement for the Debtor to remain a self-funded plan under California law.  *Id.* ¶ 46.

34.     In order to maintain the validity of the Workers' Compensation Letter of Credit, the Robert D. and Lillian D. Zacky Trust as part of the transaction to purchase the Original Credit Facility negotiated a Fifth Amendment to the Original Credit Agreement, which reduced the outstanding principal balance under the Original Credit Facility from slightly in excess of $61 million to $56,472,438.00 plus interest and accrued fees.  As part of the purchase of the Original Credit Facility, the Robert D. and Lillian D. Zacky Trust agreed to open and maintain immediately available funds in the amount of $5,000,000 in a restricted deposit account that would serve as collateral for the Workers' Compensation Letter of Credit (the "$5 Million LC Collateral").  *Id.* ¶ 47.

35.     The functional result of the Fifth Amendment was that the secured claim under the Original Credit Facility on the Debtor's assets was reduced by $4,527,562.00.  As such, the Robert D. and Lillian D. Zacky Trust has required as a condition to entering into the proposed debtor in possession financing facility (the "DIP Facility") that the Debtor post-petition replace

the $5 Million LC Collateral posted by the Robert D. and Lillian D. Zacky Trust with the Debtor's own funds to be drawn on the DIP Facility.  A copy of the Fifth Amendment is attached as Exhibit 4.  *Id.* ¶ 48.

36.    On October 5, 2012, the Robert D. and Lillian D. Zacky Trust purchased the Original Credit Facility from Wells Fargo.  *Id.* ¶ 49.

37.    On October 8, the Debtor executed a Sixth Amendment to the Original Credit Facility that reflected the Robert D. and Lillian D. Zacky Trust's purchase.  A copy of the Sixth Amendment is attached as Exhibit 5.  *Id.* ¶ 50.

**Brief Summary of the Debtor's Assets**

38.    Based on the unaudited year-end financials, as of December 31, 2011, the Debtor's net book value of property plant and equipment was approximately $24 million.  *Id.* ¶ 51.

39.    As of July 31, 2012, the Debtor's current cash and receivables totaled approximately $10 million and inventory totaled approximately $35 million.  *Id.* ¶ 52.

40.    As of the filing, the total cash collateral subject to the Original Credit Facility liens is approximately $45 million.  This amount excludes the equipment and other collateral, including goodwill and trademarks.  As set forth in the Cooper Declaration and based on available appraisals and Mr. Cooper's experience in the industry, the Original Credit Facility is likely a fully secured obligation.  *Id.* ¶ 53.

**Unsecured Claims**

41.    The Debtor estimates that there exists approximately $34 million in unsecured trade debt including approximately $17.5 million owed to IGM.  *Id.* ¶ 55.

42.    Western Milling, LLC ("Western Milling") may claim a poultry supply lien for feed and materials delivered to the Debtor pursuant to a UCC-1 financing statement filed on August 15, 2012 ("Western Milling Lien").  The Debtor has been paying Western Milling in cash for all deliveries made after the Western Milling Lien was established, thus, Western Milling has no secured claim.  *Id.* ¶ 58.

43.    Moreover, even if Western Milling has a secured claim, the priority of its lien is junior to the Wells Fargo Lien and out of the money.  The priority of the Western Milling Lien is

determined by the date the UCC-1 financing statement is filed with the Secretary of State - the Western Milling Lien does not prime any previously perfected liens. Because the Wells Fargo UCC-1 was filed on November 17, 2009, any security interest of Western Milling would be junior to the Wells Fargo Lien. Given that the current amount of cash collateral available is only $45,000,000, which is lower than the outstanding obligations on the senior Original Credit Facility of $56,472,438.00 plus accrued fees and interest, the Western Milling Lien would be an unsecured claim because it is out of the money. *Id.*

**Other Secured Claims**

44.     In addition to the Original Credit Facility lien, the Western Milling Lien, and the above-described Prepetition Bridge Liens, Robert Reiser & Co., Inc. asserts a security interest in: one VEMAG Model MMP220 Minced Meat Portioner; one Model 2380 Tray Feeder; and one Model 1120 Tray Denester - PTP pursuant to a UCC-1 financing statement filed on October 31, 2011 ("Reiser Lien"). The Reiser Lien is not being primed. *Id.* ¶¶ 56-57.

45.     In addition to liens through recorded UCC-1 financing statements, there may be other unrecorded liens of which the Debtor is unaware (the "Unknown Liens"). *Id.* ¶ 59.

**Other Potential Claims**

46.     Additionally, there are certain contract growers that may assert a statutory trust over the birds under their care under the Poultry Producers Financial Protection Act of 1987, which establishes a statutory trust that is virtually identical to the statutory trust in favor of fruit and vegetable producers under the Perishable Agricultural Commodities Act (the "Grower Interests"). Birds under the statutory trust are not considered property of the estate. *Id.*

47.     Finally, other creditors, such as the customers with allowance may also hold setoff rights against the Debtor ("Customer Setoff Rights"). *Id.*

### EMERGENCY NEED

48.     A failure to obtain authorization for the use of cash collateral and additionally the DIP bridge financing outlined below would cause immediate and irreparable damage to Zacky Farms, its employees, creditors and owners. *Id.* ¶ 71.

49.     Zacky Farms is currently raising approximately 2.5 million birds, which cost

approximately $1.8 million per week for feed alone.  If the birds are not continuously fed, they begin fighting, with significant numbers expected to die, creating an almost immediate health and safety issue as well as significantly impacting the Debtor's compliance with industry standards for animal welfare.  Any interruption in proper care of the Debtor's birds, as well as any publicity generated by such interruption, could endanger important relationships with the Debtor's customers.  *Id.* ¶ 72.

50.   Zacky Farms only has the capacity to process a fraction of the 2.5 million birds it currently has on the ground.  It does not have the plant capacity to properly manage the disposal of such a great volume of birds should they die due to an interrupted feed supply.  In addition, Zacky Farms would not have sufficient transportation capacity to haul and dispose of that number of birds if the birds were to stop being fed.  *Id.* ¶ 73.

51.   A failure to continue to operate and feed the birds through this Thanksgiving season and year end will result in significant cash losses to Zacky Farms as well as the much larger long term losses a hard stop would cause in terms of layoff liabilities of over 1,000 employees, the loss of any going concern value from this business, and the disposal of the 2.5 million birds Zacky Farms currently has on the ground.  *Id.* ¶ 74.

52.   Finally, in addition to the immediate gain from operating through the holiday season and the avoidance of significant damages from a business hard stop, selling poultry operations as going concerns, preserving the value of Zacky Farms, LLC as a going concern will result in significantly more value to the bankruptcy estate even with the terms proposed by the proposed DIP lender.  *Id.* ¶ 75.

53.   A failure to immediately approve debtor in possession financing will cause the business immediate and irreparable harm.  Quite simply, absent relief, the Debtor only has feed sufficient to feed the birds through Friday, October 12, 2012.  *Id.* ¶ 76 and the Order approving emergency ex parte motion re limited use of cash collateral (Dkt. No. 17).

54.   The Debtor's standard practice is to receive feed shipments on a daily basis from its feed supplier, Western Milling.  Given that the Debtor is on pre-pay with Western Milling, which is also a pre-petition creditor that has filed a UCC-1 as described above, the Debtor will

need to wire transfer funds on Thursday, October 11, 2012, to the feed vendor in order that feed is delivered for the next day's usage. Cooper Declaration ¶ 77.

## SUMMARY OF PROPOSED DIP FACILITY AND TERMS

55.     As described above, the Robert D. and Lillian D. Zacky Trust has been the primary pre-petition owner of the Debtor who has been advancing funds to continue operations during the summer of 2012. *Id.* ¶ 78.

56.     The Robert D. and Lillian D. Zacky Trust is prepared to advance the cash needed to fund the Debtor through the first week of January 2013, through a new post-petition debtor in possession financing facility (the "DIP Facility"). *Id.* ¶ 79[5].

57.     As a condition to making the DIP Facility, all collections of cash collateral that are collateral for the Original Credit Facility must be used to pay down the obligations owed under the Original Credit Facility only. No cash collateral is to be used in the operation of the Debtor, post-petition. *Id.* ¶ 80.

58.     Based on the 2.5 million birds currently on the ground and the amount of time it takes to raise either a chicken or a turkey to the point of processing, all receipts received post-petition through year end will be collections of cash collateral that all to be applied to the Original Credit Facility. *Id.* ¶ 81.

59.     The DIP Facility will be secured by all of the Debtor's assets including its real estate assets, which were not originally collateral for the Original Credit Facility. The Prepetition Bridge Liens will be senior to the DIP Facility's liens on the applicable real estate. The DIP Liens will prime the liens securing the Original Credit Facility. *Id.* ¶ 82.

60.     The Robert D. and Lillian D. Zacky Trust has consented to the Original Credit Facility being primed and the Debtor's use of its cash collateral subject to it receiving, among other things, adequate protection liens and a pay-down of the Original Credit Facility as set forth in the Interim DIP Order and the Budget. *Id.*[6]

---

[5] The Cooper Declaration incorrectly refers to the Lillian Zacky Trust. The post-petition lender is Robert D. and Lillian D. Zacky Trust.
[6] The Prepetition Lender referred to in the Cooper Declaration is the Robert D. and Lillian D. Zacky Trust.

DEBTOR'S MOTION TO APPROVE DIP FINANCING AND
AUTHORIZE USE OF CASH COLLATERAL

61.    The DIP Financing is fully conditional upon the pay-down of the Original Credit Facility and the other protections provided under the Interim DIP Order. *Id.*

62.    The maximum amount of the DIP Facility that is anticipated to be drawn through year end is approximately $60 million.  A copy of the proposed budget through year end is attached as Exhibit 6.  Maximum combined borrowing, including both the Original Credit Facility and the DIP Facility, through year end is approximately $70 million in week 5.  *Id.* ¶ 83.

63.    Below is a chart that summarizes some of the salient points of the proposed DIP Facility: *Id.* ¶ 84.

| Loan Provision | Description |
|---|---|
| DIP Facility Ceiling | $71,000,000 |
| Term | From entry of interim order through January 31, 2013 |
| Interest Rate | 6.00% per annum |
| Costs | All out of pocket costs, fees and expenses |
| Fees | A Front-End Fee of 3.00% of DIP Facility Ceiling funded on entry of interim order, an unused line fee of 1.5% per annum, and a Collateral Monitoring Fee of $50,000 per month |
| Liens | First priority liens on all pre and post-petition assets of the debtor subject to only the approximately $4 million of deeds of trust on real estate collateral and the Reiser Lien, defined below ("Senior Secured Debt") |
| Priming | The DIP Facility shall prime all secured claims except the Senior Secured Debt |
| Sale Process | There is a requirement of the commencement of an immediate sale process to sell the Debtor as a going concern |

64.    The foregoing summary does not include all material terms.  Attached as Exhibit 8 to the Cooper Declaration is the proposed DIP Facility credit agreement. *Id.* ¶ 85.

**DIP Facility Provisions that Potentially Implicate the Guidelines**

65.    The DIP Facility does not conform with the following provisions of the Local Rules as follows:

a.    CROSS COLLATERALIZATION (Local Rule 4001-1(c)(3)(A)):  Because

the DIP Facility is a new loan, it does not violate the cross-collateralization

provision.  However, because the new DIP loan essentially rolls up the

Original Credit Facility, the new DIP loan is secured by additional real estate

collateral that did not secure the Original Credit Facility.  The real estate

collateral is subject to the Prepetition Bridge Liens.  There are no current

appraisals of the additional real estate collateral, but in FTI's discussions with

a lender who FTI believes is relatively familiar with the real estate collateral,

that lender did not believe that sufficient collateral existed to support a $10

million bridge loan.  *Id*. ¶ 86.a.

b.  FINDINGS RE VALIDITY, PERFECTION OR AMOUNT OF LIEN (Local

Rule 4001-1(c)(3)(B)):  The Debtor stipulates in paragraphs E and F on pages

5-7 of the Proposed Interim Order that the pre-existing liens and the amounts

owed under the Original Credit Facility are valid and as set forth in the

Proposed Interim Order.  Paragraph 25(b) of the Proposed Interim Order gives

the Committee and/or other parties in interest the ability to challenge the

stipulations and acknowledgements contained in the Proposed Interim Order

no later than

> . . . the earliest of (A) 10 days before the first date scheduled for
> the confirmation hearing on the Plan and (B) 30 days (or such
> later date as has been agreed to, in writing, by the Prepetition
> Lender in its sole discretion) after the initial selection of counsel
> by the Committee, and (C) 45 days after the Petition Date in the
> event no Committee is appointed;

(hereafter referred to as the "Lien Challenge Period").  In negotiations prior to

the bankruptcy filing, the Debtor requested and the lender agreed to include

the Lien Challenge Period in the Proposed Interim Order as well in any

subsequent final order, and that the Committee be authorized to expend up to

$25,000 to investigate whether such a lien challenge and/or an objection to the

proposed release (see below) be brought within the Lien Challenge Period.  *Id*.

¶ 86.b.

c.  FINDINGS RE RELATIVE PRIORITIES OF LIENS (Local Rule 4001-1(c)(3)(C)):  Subject to the Lien Challenge Period, the Debtor stipulates in paragraph E of the Proposed Interim Order that the Debtor granted Wells Fargo ". . . valid first priority liens . . . upon all of Zacky Farms' accounts receivable, inventory, and equipment, and all proceeds thereof and accessions thereto." *Id*. ¶ 86.c.

d.  WAIVER OF 506(C) (Local Rule 4001-1(c)(3)(D)):  In paragraph I(c) of the Proposed Interim Order, the Court is requested to make a finding that in paragraph I(c) a waiver of section 506(c) of the Bankruptcy Code as to the Original Credit Facility is warranted given the concessions and carve outs granted in the proposed DIP Facility.  In Paragraph 8 of the Proposed Interim Order, the prohibition of charging the collateral of the proposed DIP Facility pursuant to section 506(c) of the Bankruptcy Code would become effective upon entry of the final order approving the DIP Facility.  Prior to the filing, the Debtor negotiated a $150,000.00 carve out for any Chapter 7 Trustee as additional consideration for the 506(c) waiver.  *Id*. ¶ 86.d.

e.  SUB ROSA PLAN PROVISION (Local Rule 4001-1(c)(3)(E)):  The DIP Facility does not divest the debtor in possession of any discretion in the filing of a plan although it does require a sale process for substantially all of the Debtor's assets.  The Debtor believes this requirement is reasonable because given the current capitalization debt and ownership structure of the Debtor, it is crucial to explore a sale of the Debtor as a going concern as quickly as possible to preserve value and maximize the return to the estate.  The DIP Facility documents also make it an event of default to file any pleading, ". . . which could be expected to result in a material impairment of the rights or interest of the Lender." *See* DIP Facility, Article 9 (r).  *Id*. ¶ 86.e.

f.  RELEASES OF LIABILITY (Local Rule 4001-1(c)(3)(F)):  In paragraph 13 of the Proposed Interim Order the Debtor, effective upon entry of a final order

approving the DIP Facility, provides a complete and total release of known and unknown claims ("Proposed Release") against ". . . the Prepetition Secured Lender, the DIP Lender, and each of their respective, affiliates, agents, representatives, partners, financial advisors, legal advisors, managers, consultants, accountants and attorneys . . .with respect to or relating to the Prepetition Loan Obligations, the Prepetition Liens, the Prepetition Loan Documents, the DIP Obligations, the DIP Documents, and the DOP Financing" These releases are, however, subject to the Lien Challenge Period and, as described above, the Debtor negotiated the ability of the Committee to expend $25,000 to investigate whether such release is warranted. *Id.* ¶ 86.f.

g. WAIVERS OF AVOIDANCE ACTIONS (Local Rule 4001-1(c)(3)(G)): The Proposed Release in Paragraph 13 of the Proposed Interim Order includes releases of all avoidance actions ". . . under chapter 5 of the Bankruptcy Code." These waivers and releases are, however, subject to the Lien Challenge Period and as described above, the Debtor negotiated the ability of the Committee to expend $25,000 to investigate whether such release is warranted. *Id.* ¶ 86.g.

h. AUTOMATIC RELIEF FROM AUTOMATIC STAY (Local Rule 4001-1(c)(3)(H)): The title of the Proposed Interim Order highlights a proposed modification of the automatic stay, as well as numerous provisions in the Proposed Interim Order, including Paragraph 5(b) which vacates the automatic stay as follows: (i) upon the occurrence and during the continuance of a DIP Event of Default, after providing five days' prior written notice to (a) the Debtor, (b) counsel to any Committee, and (c) the U.S. Trustee, or (ii) on the date on which all loans and obligations under the Facility shall be repaid in full in cash, which shall be the earliest of: (a) the stated maturity of the DIP Facility, which shall be January 31, 2013, (b) the effective date of any chapter 11 plan of the Debtor, (c) the date that is 30 days after the Interim Order Entry

Date if the Final Order Entry Date shall not have occurred by such date, and

(d) the acceleration of the loans or termination of any amount of the DIP

Financing, including, without limitation, as a result of the occurrence of an

Event of Default.  *Id.* ¶ 86.h.

i.    WAIVERS OF FORECLOSURE TIMELINES (Local Rule 4001-1(c)(3)(I)):

The Proposed Interim Order does not modify the procedural requirements for

foreclosure under California law.  *Id.* ¶ 86.i.

j.    LIENS ON AVOIDANCE ACTIONS  (Local Rule 4001-1(c)(3)(J)):

Paragraph 4 of the Proposed Interim Order grants a security interest in all

assets of the Debtor and there is no explicit exception for avoidance actions,

but Paragraph 3 of the Proposed Interim Order, makes clear that prior to

asserting a superpriority claim on the " . . . proceeds of avoidance actions . . ."

under Chapter 5 of the Bankruptcy Code . . . "the DIP lender will first use. . ."

its reasonable best efforts to satisfy the Superpriority Claims from DIP

Collateral or the proceeds of DIP Collateral prior to seeking to utilize proceeds

of avoidance actions under Chapter 5 of the Bankruptcy Code.  *Id.* ¶ 86.j.

k.    WAIVERS OF RIGHT TO MOVE FOR USE OF CASH COLLATERAL

WITHOUT CONSENT (Local Rule 4001-1(c)(3)(K)):  The Proposed Interim

Order does not explicitly include a waiver by the Debtor of its right to move

for use of cash collateral without the consent of the DIP Facility lender.

Section 13.4 of the DIP Facility Credit Agreement, however, provides that

"No consent, modification, amendment, or waiver of any provision of any

Loan Document shall be effective unless executed in writing by or on behalf

of the party to be charged with such modification, amendment or waiver . . ."

*Id.* ¶ 86.k.

l.    GOOD FAITH FINDING (Local Rule 4001-1(c)(3)(L)):  Paragraph I of the

Proposed Interim Order includes certain good faith findings that the Court

may believe exceed what are normally approved in Local Rule 4001-

1(c)(3)(L). *Id.* ¶ 86.l.

66.     The Debtor respectfully submits that the Court should approve the DIP Facility, notwithstanding the above described variations from the Local Rules, chiefly because there is no logical business alternative and obtaining the DIP Facility is in the best interests of the estate. Prior to the filing, the Company attempted to revise the DIP Facility to remove any deviations from the Local Rules, but the Robert D. and Lillian D. Zacky Trust would not provide the DIP Facility under such terms. *Id.* ¶ 87.

## POTENTIAL ALTERNATIVE LENDERS

67.     In the exercise of its fiduciary duties, the Company also was pursuing potential alternatives to the restructuring transaction.

68.     Keith Cooper, the CRO, contacted a national bank with whom he had dealings in the past regarding the possibility of its taking out the Wells Fargo Original Credit Facility and making additional advances as part of a DIP Facility.  Based on these conversations, Mr. Cooper concluded that this national bank would only have considered such a loan if (a) the Robert D. and Lillian D. Zacky Trust agreed to maintain its pledge of collateral to back stop the Original Credit Facility, and (b) the national bank could obtain all existing collateral as well as the real estate.  *Id.* ¶ 89.

69.     Based on Mr. Cooper's experiences in dealing with a multitude of lenders in various troubled company circumstances, he also concluded that alternative lenders would not make a loan to the Debtor on terms less onerous than the proposed DIP Facility, and that logistically even if the Company had the time to solicit multiple expressions of interest, lenders cannot move quickly enough to fund in the time frame required. *Id.* ¶ 90.

70.     Knowing the problems the Company faced on a liquidity basis, other than the family, the only logical lender was Wells Fargo, and as such, Mr. Cooper also reached out to Wells Fargo to see if it would consider extending additional financing based on adding the real estate collateral.  This approach was summarily rejected.  Wells Fargo informed the Company that it was not interested in extending any additional funds to Zacky Farms. *Id.* ¶ 91.

71.     Additionally, counsel for Zacky Farms had reached out to Britz Investment Co,

Inc. ("Britz"), which executed a non-disclosure agreement and was provided confidential information about the cash needs of the business through year end and the potential real estate collateral. Originally, the Company sought an $8 million bridge loan secured only by real estate, but Britz informed the Company that it was not interested because much of the real estate was single purpose (i.e., poultry processing factories) which is not liquid enough for its needs and there was no guarantee of repayment from the sale proceeds generated during the holiday season. *Id.* ¶ 92.

72.    Last week, Sean Harding of FTI contacted Britz. Britz' initial reaction was that it did not believe that the real estate collateral was sufficient to justify a $10 million borrowing on its own. As recently as Monday, October 8, 2012, Britz confirmed in an e-mail that it believed that the real estate collateral was insufficient to support the amount of funds needed. *Id.* ¶ 93.

73.    The Company also generally reached out to the other members of the Zacky family who were unwilling to extend additional funding to the Debtor at the present time. *Id.* ¶ 94.

74.    The Robert D. and Lillian D. Zacky Trust loan is the only loan available for the Debtor at the present time, and the immediate approval of it on an emergency basis is crucial to maintain the going concern value of the Company, maintain the employment of over 1,000 jobs, and avoid the potential catastrophe that would result if the birds are not fed. *Id.* ¶ 95.

## APPLICABLE AUTHORITY

**Approval of DIP Facility and Senior Liens**

75.    Bankruptcy Code section 364(c) provides:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

76.     Bankruptcy Code section 364(d)(1) provides:

The court, after notice and a hearing, may authorize the obtaining of credit of the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)     the [debtor in possession] is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. §364(d).

77.     Bankruptcy Rule 4001(c)(2) provides, in relevant part:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

78.     Bankruptcy Rule 4001(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to Bankruptcy Code section 1102, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (ii) objections may be filed within 14 days of the mailing of the notice of the motion and the time for filing objections thereto. *See* Fed. R. Bankr. P. 4001(d)(1) – (2).

79.     As set forth above, based on discussions with potential lenders other than the Robert D. and Lillian D. Zacky Trust, the Debtor was unable to obtain postpetition financing on an unsecured basis or on a junior priority basis, and within the timeframe, that the Debtor's current liquidity situation mandated.

80.     The Debtor negotiated the DIP Facility at arms' length and have determined, in the exercise of its business judgment, that it is the best proposal under the circumstances. When, as here, this judgment is consistent with the provisions of and polices underlying the Bankruptcy Code, courts routinely granted debtor considerable deference in acting in accordance with its

business judgment.  *See, e.g., In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under Bankruptcy Code §364 to permit debtor to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest); *see also In re Defender Drug Stores,* 145 B.R. 312, 316-317 (9th Cir. BAP 1992) ("Bankruptcy courts, however, have regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364."; "While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.  Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." (citations omitted)); *In re Berry Good, LLC,* 400 B.R. 741 (Bankr. D. Ariz. 2008) (nearly identical discussion).

**The Requested Priming Lien Is Reasonable in the Circumstances of this Case**

81.    The Motion seeks to prime Wells Fargo in favor of the proposed DIP Facility under section 364(d).[7]

   a.  The Robert D. and Lillian D. Zacky Trust has consented to the priming of the liens of the Original Credit Facility.   The Robert D. and Lillian D. Zacky Trust has been served with this Motion.

   b.  As discussed above, the Western Milling Lien does not cover any collateral because the Debtor has been paying Western Milling in cash for all deliveries made since the Western Milling Lien was established.  Even if certain collateral is the subject of the Western Milling Lien, granting of a senior position in front of the Western Milling Lien is warranted given that its lien is junior to the Wells

---

[7] The DIP Facility will remain subject to the Reiser Lien and the Prepetition Bridge Liens.

DEBTOR'S MOTION TO APPROVE DIP FINANCING AND
AUTHORIZE USE OF CASH COLLATERAL

Fargo Lien securing approximately $56,500,000.00 plus accrued fees and interest, and as set forth in paragraph 58 of the Cooper Declaration, the prepetition collateral that may be subject to the Western Milling Lien is only currently valued at $45 million.   Also, no prepetition cash collateral is being used to fund post-petition obligations.  Each dollar collected post-petition reduces the senior debt of the Original Credit Facility in front of the Western Milling Lien.

    c.   The DIP Facility is also secured by a lien senior to any unrecorded liens on pre-petition assets.  The failure to record a lien makes any such lien avoidable in the bankruptcy case, and as such, granting a senior lien pursuant to the proposed Interim Order is a reasonable request.

    d.   The DIP Facility is also secured by a lien senior to any pre-petition contract grower.  The Debtor believes that this is a reasonable request because the Grower Interests are not a lien but a statutory trust interest. To the extent that the Grower Interests are not property of the estate, the proposed lien will not attach. Additionally, even if the Grower Interests constitute a lien instead of a statutory trust, it is reasonable to grant this relief because the proposed thirteen week budget, attached as Exhibit 6 to the Cooper Declaration, provides for the payment of all amounts due the growers through the week of January 4, 2013.

    e.   The DIP Facility is also secured by a lien senior to Customer Setoff Rights. The only known Customer Setoff Rights are the customer allowances, which the Debtor has requested authority to honor post-petition. It is also reasonable to grant this relief because the proposed thirteen week budget, attached as Exhibit 6 to the Cooper Declaration, provides that all such pre-petition customer allowances be honored.

**Approval of Use of Cash Collateral to Pay Original Credit Facility**

82.    In addition to the need for debtor in possession financing, the Debtor seeks approval to pay all pre-petition cash collateral collected post-petition to reduce the balance due under the Original Credit Facility.

83.    Bankruptcy Code section 363(c)(2) provides that the Debtor may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §363(c)(2).

84.    Because the Original Credit Facility is secured by a first priority lien on all pre-petition cash collateral, utilizing the collections of such collateral to reduce the Original Credit Facility is warranted.

**Modification of the Automatic Stay**

85.    Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed DIP Facility contemplates the modification of the automatic stay (to the extent applicable).

86.    Stay modification provisions of this type have become quasi-standard features of post-petition debtor in possession financing facilities and, such relief is a condition to the funding from the DIP Facility.  Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Proposed Interim Order and DIP Facility.

**Interim Approval of the DIP Credit Facility**

87.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 or to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to authorize the use of cash collateral or obtain credit as necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  The financing under the DIP Facility provides additional liquidity to the Debtor sufficient to enable it, *inter alia*, to (a) minimize disruption to its business and operations, (b) preserve and maximize the value of its estate for the benefit of all creditors and (c) avoid immediate and irreparable harm to its business, its creditors, its employees, and its assets. Without the financing provided for in the DIP Credit Agreement, the Debtor will not be able to meet its direct operating expenses and will suffer irreparable harm.

1    **<u>CONCLUSION</u>**

2       88.    The Debtor respectfully submits that the terms and conditions of the DIP Credit

3    Agreement represent the Debtor's best option to maximize value for stakeholders and facilitate its

4    sale process.

5       89.    Based upon the foregoing, the Debtor respectfully requests that the Court approve

6    the DIP Credit Facility in accordance with the terms set forth in the Proposed Interim Order and

7    the DIP Credit Agreement.

8    Dated: October 10, 2012

9                              FELDERSTEIN FITZGERALD
                             WILLOUGHBY & PASCUZZI LLP
10

11                       By:   */s/ Thomas A. Willoughby*
                              THOMAS A. WILLOUGHBY
12                            Proposed Attorneys for Zacky Farms, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEBTOR'S MOTION TO APPROVE DIP FINANCING AND
                                AUTHORIZE USE OF CASH COLLATERAL