DONALD W. FITZGERALD, State Bar No. 095348
THOMAS A WILLOUGHBY, State Bar No. 137597
JENNIFER E. NIEMANN, State Bar No. 142151
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
dfitzgerald@ffwplaw.com
twilloughby@ffwplaw.com
jniemann@ffwplaw.com

Proposed Attorneys for Zacky Farms, LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>ZACKY FARMS, LLC, a California limited liability company,<br><br>Debtor-In-Possession. | CASE NO. 12-37961-B-11<br><br>DCN: FWP-12<br><br>Date:  November 13, 2012 (proposed)<br>Time:  1:30 p.m. (proposed)<br>Courtroom: 32<br>501 I Street, 6th Floor<br>Sacramento, CA |

**DEBTOR'S MOTION TO APPROVE SALE PROCEDURES**

Zacky Farms, LLC, a California limited liability company, debtor in possession in the above-entitled bankruptcy case (the "Debtor"), files this motion (the "Motion") for authority to approve a sales procedure for the sale of substantially all of the Debtor's business assets (the "Sale Assets"), including but not limited to all of the Debtor's owned real property, goods, inventory, assumed contracts, supplies, furniture, fixtures and equipment, accounts receivable, intellectual property, goodwill, books and records, permits, licenses, vehicles and other items currently used in the Debtor's business. In support of this Motion, the Debtor respectfully represents:

**JURISDICTION**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter concerns the administration of the bankruptcy estate herein, and accordingly, this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for relief are 11 U.S.C. §§ 363 and 105. Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9014, concerning contested matters, is applicable to this proceeding.

**RELIEF REQUESTED**

2. The Debtor respectfully requests that the Court pre-approve sale and bidding procedures, described in more detail below, for the sale of the Sale Assets and for such other relief as is just and appropriate in the circumstances of this case.

**BACKGROUND**

3. On October 8, 2012 (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code"). The Debtor remains in possession of its estate, no trustee having been appointed. The Debtor is operating and managing its business as a debtor-in-possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

4. On October 16, 2012, the Office of the United States Trustee for the Eastern District of California appointed a statutory committee of unsecured creditors (the "Committee") in this case pursuant to section 1102 of the Bankruptcy Code.

5. The background of the Debtor and this bankruptcy case has been set forth previously in the Declaration of Keith F. Cooper in Support of Application for an Order Shortening Time and in Support of First Day Motion (the "First Day Motion Declaration") filed on October 9, 2012 (Dkt. No. 5) and incorporated herein by reference.

6. The Debtor is currently engaged in the production, marketing, and distribution of a variety of fresh and frozen poultry products. The Debtor's operations include the breeding, hatching, and growing of turkeys and chickens as well as processing and marketing of poultry products. First Day Declaration ¶ 9.

7. Zacky Farms employs approximately 1,000 people in Los Angeles, Fresno, Tulare, Kings, San Joaquin and San Bernardino Counties and continues to be family owned and operated. *Id.* ¶ 19.

8. Zacky Farms currently ranks among the largest turkey businesses in the United States with annual gross sales of approximately $142 million in 2010 and $146 million in 2011. *Id*. ¶ 20.

**FACTS SPECIFIC TO MOTION**

9. One of the crucial problems facing the Debtor is the recent volatility in the price for corn and other commodities, which has seriously impacted Zacky Farms' liquidity position. Over the past four years, the cost of corn and soybean meal, the Debtor's primary feed ingredients, increased significantly. The liquidity crisis has also been impacted by the seasonal nature of turkey sales. The great bulk of turkey sales occurs around the Thanksgiving holiday period. Vertically integrated turkey growers require a significantly greater amount of cash for the feed and care of the birds grown to meet consumer demands for the Thanksgiving holiday. *Id*. ¶¶ 21-25.

10. The Debtor has a long and successful history. Products have been produced and sold under the Zacky name for many years. Thus, there is potential value in the Zacky brand. The chief objective of this chapter 11 is to lead the Debtor to profitability in order to preserve the going concern value of the Debtor for its creditors, its employees and its owners. *Id*. ¶ 60.

11. Pre-petition, the Debtor's ownership explored a buyout whereby one side of the two families which own the Debtor would take full control of the Debtor. Such a buyout was not consummated. *Id*. ¶¶ 62-63.

12. The Debtor has determined that a sale of substantially all of the Debtor's assets at this juncture is the best way to maximize value for the Debtor's creditors, its employees and its owners. Declaration of Keith F. Cooper in Support of Motion to Approve Sale Procedures ("Cooper Decl.") ¶ 6.

13. Under the terms of the Debtor's DIP Facility, (i) a sale procedures motion must be filed by November 7, 2012; (ii) an auction for the sale of substantially all of the Debtor's assets must occur on or before January 15, 2013; and (iii) a sale hearing must be held by January 18, 2013. DIP Facility Agreement at Section 7.6, attached as Exhibit 8 to the Exhibit Document, filed on October 9, 2012 (Dkt. No. 8). The DIP Facility matures and must be paid in full,

including all pre- and post-petition amounts due, on or before January 31, 2013. *Id*. at p. 8.

14. On October 29 and 30, 2012, the Debtor, two major shareholders (one of which is the Robert D. Zacky and Lillian D. Zacky Trust ("DIP Lender")), and the Committee interviewed several investment bankers to assist the Debtor in marketing and selling its business as a going concern. On November 2, 2012, the Debtor chose Imperial Capital, LLC ("Imperial Capital") to assist the Debtor in the sale of the Debtor's assets. A motion to employ Imperial is being filed along with this Motion to approve the sale procedures. Cooper Decl. ¶ 7.

## PROPOSED SALE AND BID PROCEDURES

15. The Debtor, with input from Imperial Capital and preliminary comments from the Committee and the DIP Lender, has drafted sale procedures ("Sale Procedures"), which are designed to insure the highest possible price for the Sale Assets, taking into account the circumstances of this case. A true and correct copy of the Sale Procedures is attached as Exhibit A to the Exhibit Document filed with this Motion. The following is a summary of the Sale Procedures. To the extent that this summary conflicts with the Sale Procedures, the Sale Procedures shall govern.

a. Imperial Capital will put together a "data room" which will contain the customary information that buyers of a business like the Debtor's would generally want to review in deciding whether to purchase the business. Imperial Capital will share this information with any buyer who executes a confidentiality agreement and who demonstrates to Imperial Capital that the buyer has the reasonable financial ability to participate in an auction sale process within the required timeframe if the buyer is interested in doing so.

b. The Debtor, with the assistance of Imperial Capital, will solicit interest from and assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept bids seeking qualification as Qualified Bids (as defined below) until 4:00 p.m. (PST) on January 10, 2013 (the "Bid Deadline") or thereafter as permitted herein. After the Bid Deadline, the Debtor will have no obligation to furnish any due diligence information.

c. Each interested person or entity (a "Potential Bidder") that desires to make

a bid shall deliver written and electronic copies of its bid materials to: counsel for the Debtor, Felderstein Fitzgerald Willoughby & Pascuzzi LLP, 400 Capitol Mall, Suite 1750, Sacramento, California 95814 attn: Thomas Willoughby; and investment banker to the Debtor, Imperial Capital, LLC, 55 2nd Street, San Francisco California, 94105 attn: Jason Thomas.  A bid is a signed document or documents from a Potential Bidder that provide(s), at a minimum, the following:

(1)     the Potential Bidder offers to purchase substantially all or some combination of the Sale Assets;

(2)     the Potential Bidder offers to purchase the applicable Sale Assets: (a) on terms and conditions acceptable to the Debtor; (b) if available, pursuant to the terms and conditions of a Form Asset Purchase Agreement for the Sale Assets at issue, marked to show any proposed amendments or modification to the Form Asset Purchase Agreement; or (c) if there has been a Stalking Horse Agreement (as defined below), pursuant to the terms and conditions of the Stalking Horse Agreement marked to show any proposed amendments or modification to the Stalking Horse Agreement (either (b) or (c) is referred to as the "Marked Agreement");

(3)     the bid is not subject to any due diligence or financing contingency and is irrevocable until two business days following the closing of the Sale;

(4)     the bid does not entitle a bidder to any break-up fee, topping fee, termination fee, expense reimbursement or similar type of payment or reimbursement (unless it is a Stalking Horse Bid);

(5)     the bid constitutes a higher and/or better offer for the Sale Assets than that described in the Stalking Horse Bid, if any, or provides value to the Auction, all as determined by the Debtor in its discretion;

(6)     acknowledgments and representations that the Potential Bidder – (a) has had an opportunity to conduct any and all required due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Sale Assets in making its bid; (c) has prepared its bid, and will participate in the Auction, without collusion with any other party; and (d) did not rely upon

written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Sale Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Marked Agreement;

(7) the bid contains a commitment to close the sale transaction by January 31, 2013;

(8) the bid contains a commitment by the buyer to be prepared to provide admissible evidence in the form of affidavits or declarations establishing the Potential Bidder's good faith and lack of collusion, within the meaning of section 363(m) of the Bankruptcy Code; and

(9) the bid contains information sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance with respect to the assumption of any executory contracts and unexpired leases.

d. In addition, a Potential Bidder must accompany its bid with: (1) a deposit made with an escrow agent selected by the Debtor (the "Deposit Agent") equal to 10% of the Purchase Price (any such deposit, a "Good Faith Deposit"), which Good Faith Deposit must be made by certified check or wire transfer and will be held by the by the Deposit Agent in accordance with the terms of the escrow agreement to be provided by the Debtor; (2) written evidence of available cash or a commitment for financing and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtor may reasonably request; (3) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; (4) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtor in its analysis of issues arising with respect to any applicable antitrust laws; (5) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtor in its analysis of the bid; and (6) any pertinent factual information regarding the Potential Bidder's ability to obtain necessary permits and licenses for the operation of the Sale Assets.

e. Any bid received from a Potential Bidder that, in the Debtor's reasonable discretion, meets the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."

f.  At all times during the sale process (including, without limitation, when evaluating bids made at the Auction) the Debtor shall consult with the DIP Lender and the Committee (the "Consultation Requirement").

g.  In its sole discretion and subject to the Consultation Requirement, the Debtor may select one or more Stalking Horse Bidders and, without further order from the Bankruptcy Court, enter into Asset Purchase Agreement(s) with and provide Bid Protections to such Stalking Horse Bidder(s) (each, a "Stalking Horse Agreement") anytime up to 24 hours before commencement of the Auction.  The Debtor may in its sole discretion exercising reasonable business judgment provide a selected Stalking Horse Bidder or Bidders (if any) with customary and usual "stalking horse" protections.  In no event, however, shall an expense reimbursement and/or a break-up fee (the "Break-Up Fee") be provided to a Stalking Horse Bidder or Bidders (1) in an amount exceeding three percent (3%) of the transaction consideration (inclusive of interest-bearing liabilities to be assumed) of the Qualified Bid of such Stalking Horse Bidder or Bidders and (2) without either (a) the written consent of the Committee and the DIP Lender, or (b) a Court order, which order may be obtained on not less than two business days' notice to the Committee and the DIP Lender.  Notice of selection of such Stalking Horse Bidder or Bidders, including a description of any Break-up Fee, shall be immediately given to all Qualified Bidders and filed with the Court.

h.  At any time before the Debtor enters into any such Stalking Horse Agreement(s), the Debtor may file a proposed form of Asset Purchase Agreement with the Bankruptcy Court and serve such Asset Purchase Agreement as set forth above, which form Asset Purchase Agreement may serve as the form agreement for bidding on certain Sale Assets in the absence of a Stalking Horse Agreement (each, a "Form Asset Purchase Agreement"); provided that, if no Stalking Horse Agreement is entered into sooner, the Debtor will provide Potential Bidders (as defined below) through the data room with a Form Asset Purchase Agreement by December 14, 2012.

i.  For purposes of the Sale Procedures, a Stalking Horse Bidder, if any, is a Qualified Bidder, and any Stalking Horse Agreement executed by a Stalking Horse Bidder is a

Qualified Bid.

j.   The DIP Lender shall be allowed to credit bid pursuant to the provisions of Bankruptcy Code section 363(k) and for such credit bidding purposes shall deemed a Qualified Bidder and need not accompany its Bid with a Good Faith Deposit.

k.   The actual auction sale will take place on Tuesday, January 15, 2013 commencing at 10:00 a.m. at the offices of the Debtor's bankruptcy counsel, Felderstein Fitzgerald Willoughby & Pascuzzi LLP, 400 Capitol Mall, Suite 1750, Sacramento, California 95814-4434, or such other time or such other place as determined by the Debtor (the "Auction"); the auction procedures will be explained by the Debtor and its representatives to the auction participants prior to commencing the Auction. Only Qualified Bidders and their authorized representatives will be eligible to participate at the Auction and participation must occur in person. If more than one Qualified Bid is received by the Bid Deadline, the Debtor will conduct the Auction, provided, however, that the Debtor reserves the right to hold an Auction even if only one Qualified Bid is received by the Bid Deadline and to qualify other Qualified Bids in advance of the commencement of the Auction. At the conclusion of the Auction, the Debtor, in its sole discretion and subject to the Consultation Requirement, will select which bidder or bidders have provided the highest and best offer(s) for the Sale Assets in a single or multiple lots (each, a "Successful Bidder").

l.   The winning bidder must be able to close the sale on or before January 31, 2013.

m.   The Debtor will determine, in its sole discretion exercising its reasonable business judgment, which Qualified Bid is the next highest or otherwise best bid (the "Next Highest Bid") for the applicable Sale Assets in comparison to the Successful Bid. The Next Highest Bid shall be irrevocable until two business days after the closing of the Sale.

n.   A hearing to consider the Debtor's motion for approval of the sale of the Sale Assets to the highest bidder at the auction sale, as well as to assume and assign to the highest bidder of any of the Debtor's executory contracts and unexpired leases that the buyer wishes to have assigned to it will be held on or before January 18, 2013 at a time to set by the Court. The

1  Debtor will file separate sale and assumption and assignment pleadings with the Court to provide
2  parties to the unexpired leases and executory contracts to be assumed and assigned with sufficient
3  notice to object to a cure amount and/or adequate assurances of future performance.  Subject only
4  to entry by the Court of the sale order, the Successful Bidder will have until January 31, 2013 to
5  consummate the sale.  If the Successful Bidder fails to consummate the Sale because of a breach
6  or failure to perform on the part of the Successful Bidder, the Successful Bidder's Good Faith
7  Deposit shall be forfeited to the Debtor, and the Debtor shall have the right to seek any and all
8  other remedies and damages from the defaulting Successful Bidder.

**DISCUSSION**

16. Section 363(b) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b).  In considering a proposed sale, courts look at whether the sale is in the best interests of the estate based on the facts and the history of the case.  *In re American West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  This requires an examination of the "business justification" for the proposed sale.  *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653 (9th Cir. BAP 1996); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991); *In re Ernst Home Center, Inc.*, 209 B.R. 974 (Bankr. W.D. Wash. 1997).  The Trustee has "broad power" under section 363 to sell property of an estate, and indicates that "the manner of sale is within the discretion of the Trustee …."  *In re The Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

17. Courts have made clear that a debtor's business judgment is entitled to substantial deference and that a debtor has broad discretion with respect to the procedures to be used in selling assets from the estate.  *See, e.g., In re Blue Coal Corp.*, 168 B.R. 553, 572-573 (Bankr. M.D. Pa. 1994); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656-657 (Bankr. S.D.N.Y. 1992); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).  The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See,*

*e.g., Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-565 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. Inc. v Champion Int'l Corp.* (*In re Atlanta Packaging Products, Inc.*), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988).

18. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); *Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

19. A break-up fee may be approved where it is reasonable and in the best interests of the estate, with the estate not being unduly burdened. *American West Airlines*, 166 B.R. at 912.

20. The Debtor submits that there are sound reasons for pre-approval of the sale procedures and that each of the sale procedures is reasonable and in the best interests of the estate. As explained below, the procedures help ensure a competitive and fair bidding process that will allow the Debtor to undertake the sale process in as expeditious a manner as possible, which the Debtor believes is essential to maintaining and maximizing the value of its estate.

    a. Pre-approved sale procedures encourage stalking horse bidders to come forward, which will likely increase the amount the Debtor receives for the Sale Assets.

    b. Flexible sale procedures allow the Debtor to maximize its options in encouraging Potential Bidders to become a Stalking Horse Bidder if such is in the best interests of the estate.

      c.      The pre-qualification procedures, including the Good Faith Deposit, are designed to make sure that any bidder is seriously interested in purchasing the Sale Assets and financially capable of consummating the sale. The amount of the Good Faith Deposit is reasonable to achieve the goals of attracting serious buyers.

      d.      Requiring all Potential Bidders to sign a sale agreement substantially in the same form will save the estate the risk of having to renegotiate the material terms of the sale after the bidding, allow the estate to easily compare bids, and also benefit the overbidding parties since they all will be bidding on the same terms. All Potential Bidders will have copies of the form Asset Purchase Agreement early in the process.

21. As evidenced by the foregoing, the Debtor, consistent with the advice and recommendations of Imperial Capital, has concluded that the proposed sale and bidding procedures outlined above will allow the Debtor to conduct the sale of the Sale Assets in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtor will receive the best possible consideration for the Sale Assets.

22. The Debtor believes that the proposed sale procedures as set forth herein are reasonable, are likely to draw bidders if there are any interested, are not likely to chill bidding, are in the best interests of the estate, are necessary and appropriate to maximize the recovery for the Debtor's creditors, and should be approved by the Court as an exercise of the Debtor's sound business judgment. Importantly, the Debtor is not seeking at this time to have the Court approve the actual sale of the Sale Assets to the winning bidder at the auction sale. That request will be

///
///
///
///
///
///
///

set forth in a separate motion to be considered by the Court at a hearing to be held on or before January 18, 2013.

## CONCLUSION

WHEREFORE, the Debtor respectfully request this Court grant the relief requested herein, or such other and further relief as the Court deems just.

Dated: November 7, 2012

        FELDERSTEIN FITZGERALD
        WILLOUGHBY & PASCUZZI LLP

        */s/ Thomas A. Willoughby*
        THOMAS A. WILLOUGHBY
        Proposed Attorneys for Zacky Farms, LLC