1  Scott E. Blakeley (State Bar No. 141418)
   E-Mail: seb@blakeleyllp.com
2  Johnny White (State Bar No. 269306)
   E-Mail: jwhite@blakeleyllp.com
3  BLAKELEY & BLAKELEY LLP
4  2 Park Plaza, Suite 400
   Irvine, California 92614
5  Telephone: (949) 260-0611
   Facsimile: (949) 260-0613
6
7  Carmine R. Zarlenga
   (Pro Hac Vice App. Pending)
8  E-Mail: czarlenga@mayerbrown.com
   MAYER BROWN LLP
9  1999 K Street NW
   Washington, DC 20006-1101
10 Telephone: (202) 263-3000
   Facsimile: (202) 263-3300
11
12 *Attorneys for Foster Poultry Farms d/b/a Foster Farms*

13                  UNITED STATES BANKRUPTCY COURT

14                   EASTERN DISTRICT OF CALIFORNIA

15                       SACRAMENTO DIVISION

16
   In re:                                    Case No.: 12-37961
17
   ZACKY FARMS, LLC, a California limited     Chapter 11
18 liability company,
                                             DC No.: FWP-19
19
20                        Debtor-in-Possession.   Hearing Date, Time and Location:
                                             Date:    January 8, 2013
21                                           Time:    9:32 a.m.
                                             Place:   501 I Street, 6th Floor
22                                                    Department B, Courtroom 32
                                                      Sacramento, CA 95814
23                                           Judge:   Honorable Thomas C. Holman
24
25    **OPPOSITION/OBJECTION OF FOSTER POULTRY FARMS D/B/A FOSTER FARMS TO
26    DEBTOR'S MOTION FOR AUTHORITY TO ASSUME AND ASSIGN CERTAIN OTHER
      UNEXPIRED EXECUTORY CONTRACTS AND LEASES IN CONNECTION WITH THE
27    PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**
28

Creditor, Foster Poultry Farms d/b/a Foster Farms ("Foster Farms"), by and through its undersigned counsel, in opposition to *Debtor's Motion for Authority to Assume and Assign Certain Other Executory Contracts and Leases in Connection with the Proposed Sale of Substantially All of the Debtor's Assets* [Docket No. 400], respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     It is axiomatic that an "agreement that has been validly terminated pre-petition is not an assumable executory contract." *McDonald's Corp. v. Rincon E., Inc. (In re Rincon E., Inc.)*, 1994 U.S. App. LEXIS 7861 (9th Cir. Apr. 15, 1994); *see also In re Sigel & Co.*, 923 F.2d 142, 145 (9th Cir. 1991) ("If the contract had already terminated according to its terms, of course, the trustee would have nothing to assume.").  Despite this basic principle, Zacky Farms, LLC ("Debtor") now seeks an order authorizing the assumption and assignment of its October 5, 2001 Shared Services Agreement ("SSA") with Foster Farms that expired pre-bankruptcy.  Under the auspices of "assumption," Debtor seeks to transform the SSA from one that was by its express terms transitional in nature, into a perpetual contract that would require Foster Farms to supply grain in perpetuity to a third party.  Debtor cannot assume and assign the SSA for several separate and independent reasons.

2.     **_First_**, the SSA is not executory.  Instead, it terminated on July 6, 2012, when Foster Farms wrote to Debtor informing it that due to the fact that the latest transitional period identified in the SSA had expired, Foster Farms would no longer supply poultry feed under the terms of the SSA. Instead, Foster Farms began supplying poultry feed to Debtor under different terms.  At any rate, even if this Court finds that the SSA is still in effect, Foster Farms' obligation to supply poultry feed to Debtor will terminate once Debtor sells its turkey business, as explicitly stated in the SSA.  Notably, the SSA provided that Foster Farms would supply grain to the Debtor while the Debtor remained "in the turkey business," a period the parties contemplated would be temporary, and not longer than 10 years and six months under any circumstances. *See* SSA at Ex. B. § 1.  A true and correct copy of the SSA is attached hereto as Exhibit 1 and incorporated herein by reference.

3.     **_Second_**, even assuming *arguendo* that the contract was operational on the petition date and assumable, it could not be assigned to a third party because doing so would alter the defining terms

and conditions of the SSA—greatly expanding Foster Farms' obligations under the SSA in the process—which is inconsistent with the purpose and goals of 11 U.S.C. § 365(f)(1).

4.    ***Third***, the SSA is also not assignable because the identifies of Foster Farms and Debtor are central to the agreement given that both parties entered the agreement with the express purpose of ensuring that they each would have the benefit of certain services of the other while transitioning their respective businesses due to the larger acquisition.  Ex. 1 at Ex. C and § 2.3.  Permitting assignment under these circumstances runs counter to 11 U.S.C. § 365(c).

## FACTUAL BACKGROUND

5.    On March 22, 2001, Foster Farms acquired Debtor's chicken-related assets in a complex, multi-million dollar transaction.  This business consisted of the growing, processing, distributing, and selling of chicken and chicken products, and the purchased assets included the Traver Feed Mill.  A true and correct copy of the Purchase Agreement is attached hereto as Exhibit 2 and incorporated herein by reference.[1]

6.    Foster Farms did not purchase the turkey side of Debtor's business at that time.  Instead, Debtor retained its turkey business, although at the time the parties contemplated that Foster Farms would potentially purchase Debtor's turkey business at a later date.

7.    The acquisition closed on October 5, 2001.  That day, the parties signed the SSA in an effort to facilitate the transition of ownership in the Zacky Farms chicken business from Debtor to Foster Farms, and also to facilitate Debtor's transition to a turkey-only business.

8.    Under the SSA, Debtor was required to cooperate with Foster to facilitate the transfer of licensed intellectual property and IT Systems, and to also provide appropriate support services.  *See* Ex. 1 at Ex. A §§ 2-6.  Foster Farms, for its part, agreed to provide Debtor: (1) pullet chicks at a specified price for a period of 5 years (renewable once); (2) chicken parts at a specified price for a period of 5 years; (3) the option to lease ranch housing for a period of 5 years (renewable once); and (4) and the continued use of administrative premises for a period of 6 months.  *See* Ex. 1 at Ex. B.

---

[1] The SSA and Purchase Agreement contain confidential information.  As a result, Foster Farms is simultaneously filing a request to seal these documents.

9.      Notably, Foster Farms also agreed to supply poultry feed to Debtor from the Traver Feed Mill in order to facilitate the continuation of the turkey side of Debtor's business until such time as it could be sold.  Prior to the acquisition, the Traver Feed Mill had been Debtor's source of feed for its turkey business, and Debtor could not have successfully retained this business without a sure source of feed.

10.      The provision relating to feed from the Traver Feed Mill stated as follows:

> <u>Poultry Feed for the Traver Feed Mill</u>.  Purchasers will sell to Sellers poultry feed produced at the Traver Feed Mill at a price equal to Purchasers' cost plus $3.00 per ton F.O.B. Traver Feed Mill… Purchasers shall not be obligated to provide Sellers with more than 20,000 tons of feed in any month, nor more than 175,000 tons of feed in any twelve-month period.  ***The services set forth in this paragraph 1 shall continue for as long as Sellers or their Affiliates are in the turkey business;*** provided, however, that, if, after the first anniversary of this Agreement, Sellers fail to purchase any such poultry feed from Purchasers for a continuous period of six months, Purchasers' obligations under this paragraph shall terminate.  (Ex. 1 at Ex. B § 1) (emphasis added).

11.      In stating that these services would continue "for as long as [Debtor is] in the turkey business," the clear contemplation was that Foster Farms would supply poultry feed to Debtor for a limited duration.  In line with other provisions of the SSA, which capped the duration of Foster Farm's obligations at 10 years, § 1 continued that:

> If the existing turkey business is sold within 10 years from the Closing Date, Sellers and their Affiliates may assign their rights under this paragraph to the purchaser of all or substantially all of such business for a period not to exceed six months.  *Id.*

12.      Furthermore, the agreement expressly stated that the purpose of the SSA was to "facilitate the orderly continuation of [Debtor's] retained business for a ***transitional period*** following [Foster Farm's] acquisition of the Business."  Ex. 1 § C (emphasis added).  Section 2.3 of the SSA further emphasizes this understanding: "[Debtor] understand[s] that the Purchaser Provider Services provided hereunder are transitional in nature and are furnished by [Foster Farms] solely for the purpose of facilitating the performance of the transactions contemplated by the Purchase Agreement."  *Id.* § 2.3.

13.     For nearly eleven years, Foster Farms provided poultry feed to Debtor from the Traver Feed Mill at a price of its cost plus $3.00 per ton and on a "transitional" basis while it awaited the long-anticipated sale of the Zacky Farms turkey business.

14.     When by July 6, 2012, Debtor had yet to sell its turkey business, Foster Farms, through its outside counsel, wrote to Debtor to inform it that the SSA had expired on its own terms.   In the letter, Foster Farms stated that the SSA was transitional in nature and further noted that the longest transitional period (10 years) specified in the SSA had elapsed:

> "When the parties signed the SSA, they did so anticipating that the agreement would be transitional in nature and did not plan for it to continue in perpetuity.  *See* SSA at Recital C ("In order to facilitate the orderly transition of Sellers' retained business for a transitional period following Purchasers' acquisition of the Business …").  Section 2.3 of the SSA further emphasizes this understanding: "Sellers understand that the Purchaser Provider Services provided hereunder are transitional in nature and are furnished by Purchasers solely for the purpose of facilitating the performance of the transactions contemplated by the Purchase Agreement." The longest transition period referenced anywhere in the SSA is 10 years, with shorter terms of five years also specified. *See* SSA at Ex. B.  Foster Farms has been supplying poultry feed to Zacky for almost 11 years, thus exceeding even the longest arguable transition period."

15.     A true and correct copy of the letter is attached hereto as Exhibit 3 and incorporated herein by reference.  Because the transition period had elapsed, Foster Farms ceased to provide poultry feed at the price referenced in the expired SSA, but instead "implemented the price increase recently communicated to "Debtor[.]"  *Id.*

16.     Debtor began placing orders[2] under the new arrangement, and continues to do so post-petition. *See* Declaration of Randall C. Boyce ("Boyce Decl.") at ¶ 6, attached hereto as Exhibit 4 and incorporated herein by reference.

---

[2] Debtor recognizes that it owes Foster Farms millions of dollars for services rendered under the SSA. *See* Exhibit to Debtor's Motion for Authority to Assume and Assign Certain Other Executory Contracts and Leases in Connection with the Proposed Sale of Substantially All of the Debtor's Assets [Docket No. 402].  However, Debtor contends that the "Cure Amount" needed to bring its account with Foster Farms current under the SSA is $2,273,143.19.   However, Foster Farms' internal accounting, subject to potential adjustment, indicates that the cure amount pre-petition is actually $2,586,673.13.  *See* Ex. 4 (Boyce Decl.) at ¶ 7.

17.     On October 8, 2012, Zacky Farms voluntarily filed a bankruptcy petition under chapter 11 of title 11 of the United States Code, prompting the above-captioned bankruptcy proceeding.

### BASIS FOR OBJECTION

18.     Foster Farms objects to Debtor's request to assume and assign the SSA on separate and independent grounds, each of which is discussed below.

**A.      The SSA is Not Executory.**

19.     It is true that a "trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. 365(a). "An executory contract is one on which performance remains due to some extent on both sides." *Unsecured Creditors' Comm. v. Southmark Corp.*, 139 F.3d 702, 705 (9th Cir. 1998) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522) (1984) (internal citations omitted); *see also* H. R. Rep. No. 95-595 at 347 (1977) (Conf. Rep.); *see* S. Rep. No. 95-989 at 58 (1978) (Conf. Rep.).  As a result, an executory contract is an ongoing one.

20.     However, the SSA is not ongoing.  Instead, it expired on July 6, 2012, when Foster Farms informed Debtor that due to the fact that the parties had intended for the SSA to be transitional in nature, and because the longest transitional period specified in the SSA had expired, it would no longer supply poultry feed to Debtor at a price of its cost plus $3.00 per ton, as specified under the SSA. *See* Ex. 3.  Instead, Foster Farms would supply poultry feed at a difference price.  Debtor then began placing orders under the new price, thus continuing to do business with Foster Farms, albeit under an arrangement other than the expired SSA.

21.     Even assuming, however, that the SSA did not terminate at the time that Foster Farms materially changed the terms, Foster Farms' obligation to supply poultry feed will certainly end once Debtor sells its turkey business, thus ending any ongoing obligations under the agreement.  Notably, under the SSA, Foster Farms is required to supply poultry feed until the point in time that Debtor is no longer in the turkey business.  Ex. 1 at Ex. B § 1 ("the services set forth in this paragraph 1 shall continue for as long as Sellers or their Affiliates are in the turkey business.").  California statutory and case law demonstrates that the Court should analyze the express language of the SSA when interpreting the parties' agreement, and the express language clearly establishes the parties did not

intend for the SSA to extend past the sale of Debtor's turkey business. *See* Cal Civ Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); *see also Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666-67 (1995) (relying on the "express language of the contracts" to govern their construction).

22.    This Court should consider the language of the SSA as a whole when interpreting the agreement. *See* Cal Civ Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). Taken together, it is clear that the parties intended that the SSA (1) was transitional in nature; and (2) only obligated Foster Farms to supply poultry feed for as long as Debtor remained in the turkey business. Ex. 1 at C, § 2.3, Ex. B § 1.

## B.    Even if the SSA is Assumable, It is Not Assignable

23.    Even if this Court determines that the SSA is executory, it may not be assigned for two reasons. First, equitable concerns dictate that this Court should not materially expand Foster Farms' obligations under the SSA, and assigning the SSA to a third party will do just that. Second, the identities of Foster Farms and Debtor are central to the SSA and, as a result, 11 U.S.C. § 365(c) mandates that it should not be assigned.

### (i)    The Parties' Obligations May Not Be Materially Expanded Under the Guise of 11 U.S.C. 365(f).

24.    It is true that a trustee may assume and assign an agreement even if it contains an express anti-assignment clause—which the SSA does contain. 11 U.S.C 365(f)(1); *see also* Ex. 1 at § 3.8 (prohibiting assignment of the SSA).

25.    However, Debtor may not, under the auspices of 11 U.S.C. § 365(f)(1), alter the defining terms and conditions of the contract (which the parties bargained for and without which Foster Farms would never have entered the contract). Notably, the SSA was expressly "transitional" in nature, and Foster Farms agreed to supply grain from the Traver Feed Mill "for so long as [the Debtor remains] in the turkey business" on the understanding that the Debtor was seeking to sell that business in short order. Ex. 1 at § 2.3 and Ex. B. § 1.

26.    Allowing Debtor to assign its rights under the SSA to a third party now, eleven years later, would materially alter the bargain that Foster Farms expressly contracted for—i.e. supplying poultry feed on a transitional basis as part of the parties' agreed-upon services to each under as part of the larger acquisition—into a perpetual obligation that is not only outside of what the parties bargained for in 2001, but is also disfavored by courts. *Accord Aspex Eyewear, Inc. v. Vision Serv. Plan*, 472 Fed. Appx. 426, 427 (9th Cir. 2012) ("a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract") (internal citation and quotations omitted); *see also Cooper Companies v. Transcontinental Ins. Co.,* 31 Cal. App. 4th 1094, 1103 (Cal. App. 1st Dist. 1995) ("construing a contract to confer a right in perpetuity is clearly disfavored").[3]

27.    Applicable case law prohibits the use of 11 U.S.C 365 in this manner. *See, e.g., In re Howe*, 78 B.R. 226, 230 (Bankr. D.S.D. 1987) ("The goal of Section 365(f) is to enlarge the debtor's ability to assign a lease or executory contract, while the other contracting party maintains the "benefit of the bargain," thus creating a careful balance between the rights of the parties."); *see also In re Fleming Cos.*, 499 F.3d 300, 305 (3d Cir. 2007) (refusing to strike down provision with an anti-assignment effect where "the clause was 'a material and economically significant clause in the [contract] at issue.'" (internal citation omitted)); *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990) ("the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court . . . must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain."). Senate Report at

---

[3] *Accord Aspex Eyewear, Inc. v. Vision Serv. Plan*, 472 Fed. App'x. 426, 427 (9th Cir. 2012) ("a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract"); *see also Cooper Companies v. Transcontinental Ins. Co.,* 31 Cal. App. 4th 1094, 1103 (1995) ("construing a contract to confer a right in perpetuity is clearly disfavored"); *Ginsberg v. Gamson*, 205 Cal. App. 4th 873, 884 (2012) ("In general, lease provisions giving the tenant the right to perpetual renewals are disfavored"). Indeed, California courts often view such agreements as terminable by will given their indefinite nature. *Aspex Eyewear, Inc. v. Vision Serv. Plan*, 389 Fed. Appx. 664, 665 (9th Cir. 2010) ("The agreement between [plaintiff] and [defendant] appears to be one of indefinite duration, making it terminable at will of either party.") (*citing Zimco Rests., Inc. v. Bartenders and Culinary Workers Union, Local 340, AFL-CIO*, 165 Cal. App. 2d 235, 793 (1958) ("The rule is well established in California that [a]s to contracts contemplating continuing performance for an indefinite time, the general rule is that such contracts are terminable at will by either party")) (internal quotation marks omitted)

59, reprinted in 1978 U.S. Code Cong. & Admin. News at 5845; House Report at 348, reprinted in 1978 U.S. Code Cong. & Admin. News at 6304 ("If the trustee is to assume a contract or lease, the courts will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.")").

28.    The purpose of section 365(f)(3) was succinctly stated in *In re David Orgell, Inc.*, 117 B.R. 574, 576 (Bankr. C.D. Cal. 1990):

> "The clear import of section 365(f)(3) is to invalidate any provision of an executory contract or unexpired lease which burdens the debtor's ability to make an effective assignment by modifying its terms so that the assignee receives a different agreement than the debtor had."

29.    It is clear that Section 365(f)(3) cuts against allowing assignment in this case.  Notably, the longest transition period referenced anywhere in the SSA is ten years, with shorter terms of five years also specified.  Ex. 1 at Ex. B.  Moreover, the express language of the SSA states that in the event that Debtor sells its turkey business within 10 years of the closing date—*i.e.*, no later than October 5, 2011—then Debtor may assign its rights as it relates to the supply of poultry feed to a third party "for a period not to exceed six months."  *Id.*  Thus, even giving the agreement the most generous interpretation possible, the transitional period could not conceivably have lasted beyond April 2012.  If this court permits Debtor to assume and assign the SSA, then Foster Farms, rather than being bound to a transitional agreement as agreed, would be required to supply a third party with poultry feed for an indefinite period, thus impermissibly modifying the agreement.  Ex. 1 at Ex. B; 11 U.S.C. § 365(f)(3).  This significant expansion of the terms of its obligations bears no resemblance to the SSA and is inequitable in light of existing case law.  *In re Howe*, 78 B.R. at 230.

### (ii)    § 365(c) Prohibits Assignment Because the Identity of the Parties is Central to the SSA.

30.    This Court should also refuse Debtor's request to assume and assign the SSA because 11 U.S.C. § 365(c) dictates that an agreement should not be assigned to a third party when the identities of the parties are central to the agreement:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

31.     The purpose of 11 U.S.C. § 365(c) is "to prevent a trustee from forcing a party to accept performance from, or provide performance to, someone other than the party with whom it contracted in those situations where the identity of the party is central to the obligation itself." *Metropolitan Airports Comm'n v. Northwest Airlines (In re Midway Airlines)*, 6 F.3d 492, 495 (7th Cir. 1993). In determining whether the identity of a party is central to the contract itself, the contract must be analyzed in its entirety. *See e.g. In re David Orgell, Inc.*, 117 B.R. 574, 575-576 (Bankr. C.D. Cal. 1990) ("It is well settled that if a debtor elects to assume an executory contract or unexpired lease, it must assume the entire contract"); *In re Fastrax, Inc.*, 129 B.R. 274, 278 (Bankr. M.D. Fla. 1991) (contract is assignable "if, *from a consideration of the entire contract*, it appears that personality is not an essential consideration") (emphasis added); *In re Village Rathskeller, Inc.*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) ("when the executory contract or lease is assumed, it is said to be assumed *cum onere*… An executory contract cannot be rejected in part and assumed in part.")

32.     Moreover, Section 365(c) forbids assignment where "applicable law … excuses a party… from accepting performance from or rendering performance to an entity other than the debtor. 11 U.S.C. § 365(c). Applicable California law prohibits assignment of agreements that are "of a distinctly personal and non-delegable character" (*Husain v. McDonald's Corp.*, 205 Cal. App. 4th 860, 868 (Cal. App. 1st Dist. 2012)); *see also Civ Code* § 3390 ("The following obligations cannot be specifically enforced: 1. An obligation to render personal service"); *Coykendall v. Jackson*, 17 Cal. App. 2d 729, 731 (Cal. App. 1936) ("an executory contract for personal services involving a personal relation of confidence between the parties, or involving liabilities or duties, which in express terms impute or indicate reliance on the character and personal ability of the parties, cannot be assigned.")

33.     It is clear that the identity of the parties is an essential element of the SSA, which, considered in its entirety, is replete with obligations that are by their nature personal to the parties. For example, the SSA requires the following:

a. Debtor to make "custom applications" used in its business available to Foster (Ex. 1 at Ex. A § 1);

b. Cooperation to "secure releases from the appropriate suppliers to allow legal temporary use of [Debtor's] licensed systems" and to "use any custom modifications or interfaces made by [Debtor] to the licensed software" (*Id*. § 2);

Maintenance of Debtor's "existing IT system in a manner and at a level of performance consistent with past practices" (*Id*. § 4);

c. "Reasonable access to [Debtor's] systems for testing and training purposes" (*Id*. § 5a);

d. "Reasonable access to [Debtor's] information systems (IS) staff," (*Id*. § 5c); and

e. "Repair and support of all [Foster Farms'] supported systems in a timely manner." (*Id*. § 6a).

34.     These are duties that could not be performed by anyone other than Debtor because only Debtor possessed the requisite intimate knowledge of its former chicken business to provide such services.  Similarly, under the SSA, Foster Farms was required to provide a number of services to Debtor that it was uniquely positioned to do, such as leasing executive offices to Debtor at Debtor's former headquarters (*see* Ex. 1 at Ex. B § 5); *see also id*. at § 6 (Foster Farms to lease offices to Debtor from its Belgravia administrative building).  Case law is clear that an agreement should not be assigned under these circumstances.  *See e.g. In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986) ("A contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability forms an exception to the general rule of assignability of contracts, and is not assignable by the party under obligation to make such performance, without the consent of the other party to the contract." (internal citation and quotations omitted)).

35.     Because the SSA rested upon a unique and special relationship between Foster Farms and Debtor that was created as a result of Foster Farms' multi-million dollar acquisition of the Zacky Farms chicken business, the contract, even if operative, is not freely assignable.

## CONCLUSION

In light of the above reasons, Foster Farms objects to Debtor's motion to assume and assign the SSA.

1  Dated: December 26, 2012                    Respectfully submitted,

2                                              BLAKELEY & BLAKELEY LLP

3                                              By:  /s/ Scott E. Blakeley
4                                                   Scott E. Blakeley
                                                    Johnny White
5
                                               *Attorneys for Foster Poultry Farms d/b/a Foster*
6                                              *Farms*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1
**Is filed with Foster Poultry Farms' Request to Seal Documents**

# EXHIBIT 2
**Is filed with Foster Poultry Farms' Request to Seal Documents**

**EXHIBIT 3**

MAYER·BROWN

Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101

Main Tel +1 202 263 3000
Main Fax +1 202 263 3300
www.mayerbrown.com

**Carmine R. Zarlenga**
Direct Tel +1 202 263 3227
Direct Fax +1 202 263 5227
czarlenga@mayerbrown.com

July 6, 2012

VIA UPS DELIVERY

Mr. Scott Zacky
Zacky Farms
1482 East Valley Road, #718
Santa Barbara, CA 93108

Re:     Traver Feed Mill

Dear Mr. Zacky:

My client Foster Farms has requested that I provide you with the following relating to the recent increase in the price of poultry feed sourced from the company's Traver Feed Mill.  As you are aware, since October 5, 2001, Zorro Leasing LLC, Fresno Farming LLC, and Foster Poultry Farms (collectively, "Purchasers") have well and faithfully supplied Zacky Farms, Zacky Foods, and A.B. AG Services, Inc. (collectively, "Sellers") with poultry feed produced at the Traver Feed Mill.  *See* Shared Services Agreement ("SSA"), which is enclosed for your convenience.

When the parties signed the SSA, they did so anticipating that the agreement would be transitional in nature and did not plan for it to continue in perpetuity.  *See* SSA at Recital C ("In order to facilitate the orderly continuation of Sellers' retained business for a transitional period following Purchasers' acquisition of the Business…").  Section 2.3 of the SSA further emphasizes this understanding: "Sellers understand that the Purchaser Provided Services provided hereunder are transitional in nature and are furnished by Purchasers solely for the purpose of facilitating the performance of the transactions contemplated by the Purchase Agreement."   The longest transitional period referenced anywhere in the SSA is 10 years, with shorter terms of five years also specified.  *See* SSA at Ex. B.  Foster Farms has been supplying poultry feed to Zacky for almost 11 years, thus exceeding even the longest arguable transition period.

In the nearly 11 years since the parties signed the SSA, the grain markets have experienced unprecedented upheaval, which in turn have rendered the previous pricing obsolete and commercially impracticable.  Accordingly, Foster Farms has implemented the increase recently communicated to you to bring the price of poultry feed processed at the Traver Feed Mill more in line with prevailing market conditions and commercial reality.

Mayer Brown LLP

Mr. Scott Zacky
July 6, 2012
Page 2

Should you have any questions about the foregoing, please let me know.

Sincerely,

Carmine R. Zarlenga

Enclosure

**EXHIBIT 4**

Scott E. Blakeley (State Bar No. 141418)
E-Mail: seb@blakeleyllp.com
Johnny White (State Bar No. 269306)
E-Mail: jwhite@blakeleyllp.com
BLAKELEY & BLAKELEY LLP
2 Park Plaza, Suite 400
Irvine, California 92614
Telephone: (949) 260-0611
Facsimile: (949) 260-0613

Carmine R. Zarlenga
(Pro Hac Vice App. Pending)
E-Mail: czarlenga@mayerbrown.com
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Foster Poultry Farms d/b/a Foster Farms*

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re:

ZACKY FARMS, LLC, a California limited
liability company,

Debtor-in-Possession.

Case No.: 12-37961
Chapter 11

DC No.: FWP-19

**DECLARATION OF RANDALL C.
BOYCE, ESQ. IN OPPOSITION TO
DEBTOR'S MOTION FOR AUTHORITY
TO ASSUME AND ASSIGN CERTAIN
OTHER UNEXPIRED EXECUTORY
CONTRACTS AND LEASES IN
CONNECTION WITH THE PROPOSED
SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS**

Hearing Date, Time and Location:
Date:    January 8, 2013
Time:    9:32 a.m.
Place:   501 I Street, 6th Floor
         Department B, Courtroom 32
         Sacramento, CA 95814
Judge:   Honorable Thomas C. Holman

DECLARATION OF RANDALL C. BOYCE, ESQ. IN OPPOSITION

I, Randall C. Boyce, hereby declare as follows:

1.     I am the Senior Vice President and General Counsel of Foster Poultry Farms ("Foster Farms").  Based on my experience at Foster Farms and my firsthand experience with both agreements, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     As part of my duties and responsibilities as the Senior Vice President and General Counsel of Foster Farms, I supervised and managed attorneys with the law firm of Latham & Watkins in the negotiation of both agreements.  On March 22, 2001, Foster Farms, Inc., Zorro Leasing LLC, Fresno Farming LLC signed a Purchase Agreement to acquire the Zacky Farms chicken business from Zacky Farms, Zacky Foods, and A.B. AG Services, Inc.  The Zacky Farms chicken business consisted of the growing, processing, distributing, and selling of chicken and chicken products.

3.     The parties entered into several other agreements that were related to the Purchase Agreement.  One of those agreements was the Shared Services Agreement, which the parties signed on the closing date of the acquisition, or October 5, 2001.  Under the Shared Services Agreement, Foster Farms agreed to supply Zacky Farms with poultry feed from the Traver Feed Mill, which Foster Farms had acquired as part of the acquisition, in order to ensure that Zacky Farms would have a secure source of poultry feed for purposes of its turkey business.

4.     The Purchase and Shared Services Agreements are attached as Exhibits 1 and 2 to Foster Farms' Opposition to *Debtor's Motion for Authority to Assume and Assign Certain Other Executory Contracts and Leases in Connection with the Proposed Sale of Substantially All of the Debtor's Assets* [Docket No. 400].

5.     In my capacity as the Senior Vice President and General Counsel I have maintained copies of both agreements and can attest to their authenticity.

6.     In addition, on July 6, 2012, Foster Farms sent a letter to Zacky Farms informing it that because the longest transitional period in the Shared Services Agreement had expired, Foster Farms would no longer supply poultry feed to Zacky Farms at a price of its cost plus $3.00 per ton, as detailed in the Agreement.  Instead, Foster Farms began selling poultry feed to Zacky Farms at a price of its

cost plus $15.00 per ton.  Since the price change, Foster Farms has supplied poultry feed to Zacky Farms at the new price.

7.    Based on my review of Foster Farms' business records, my current belief as to the amount owed to Foster Farms for prepetition deliveries to the Debtor, subject to further accounting, is $2,586,673.13.

I declare under penalty of perjury that the foregoing it true and correct. Executed on December 26, 2012 at Pleasanton, California.

_____
Randall C. Boyce