DONALD W. FITZGERALD, State Bar No. 095348
THOMAS A WILLOUGHBY, State Bar No. 137597
JENNIFER E. NIEMANN, State Bar No. 142151
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
dfitzgerald@ffwplaw.com
twilloughby@ffwplaw.com
jniemann@ffwplaw.com

Attorneys for Zacky Farms, LLC

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>ZACKY FARMS, LLC, a California limited liability company,<br><br>Debtor-In-Possession. | CASE NO. 12-37961<br><br>Date:  April 23, 2013<br>Time:  1:31 p.m.<br>501 I Street, 6th Floor<br>Sacramento, CA |

**DISCLOSURE STATEMENT ACCOMPANYING
DEBTOR'S AMENDED PLAN OF LIQUIDATION
(DATED: APRIL 16, 2013)**

# TABLE OF CONTENTS

I. INTRODUCTION AND PURPOSE OF DISCLOSURE STATEMENT ....................................1

II. HISTORY AND NATURE OF THE DEBTOR'S BUSINESS ....................................3

    A.    Overview ....................................3

    B.    Prepetition Efforts to Avoid Bankruptcy ....................................3

    C.    The Debtor's Pre-Petition Credit Facility ....................................5

    D.    Preparations for a Bankruptcy Filing ....................................6

III. POST-PETITION EVENTS ....................................6

    A.    Ongoing Business Operation and Approval of DIP Facility....................................6

    B.    Retention of Imperial Capital....................................8

    C.    Zacky Farms Sales Procedures. ....................................8

    D.    Marketing and Auction Sale of Zacky Farms Operating Assets....................................9

    E.    DIP Lender Lien Challenge Investigation. ....................................9

    F.    DIP Lender Settlement Negotiations and 503(b)(9) Negotiations....................................11

    G.    Post-Auction Sale and DIP Lender Hearings....................................12

        1.    January 18, 2013 Hearing ....................................12

        2.    DIP Lender Withdrawal from the Sale Process and Acceptance of Pitman Backup Bid ....................................13

        3.    January 28, 2013 Hearing ....................................13

        4.    February 6, 2013 Hearing ....................................13

        5.    February 20, 2013 Hearing ....................................14

        6.    February 26-28, 2013 Closing ....................................14

    H.    Potential Litigation....................................14

        1.    Potential Litigation Against Richard and Sharon Zacky Entities. ....................14

        2.    Avoidance Litigation....................................15

        3.    Retention of Jurisdiction and Other Claims ....................................16

    I.    Appointment of Creditors' Committee. ....................................17

    J.    Appointment of Professionals ....................................17

1.    Professionals of the Debtor ...................................................... 17

2.    Professionals of the Committee ............................................... 18

3.    Appointment of Personnel Outside of Ordinary Course of Business under 11 U.S.C. § 363 ........................................................... 18

K.    Claims Against the Estate. ...................................................... 18

1.    Prepetition Claims. ................................................................ 18

2.    Administrative Claims Other Than Professional Fees and 503(b)(9) Claims. ................................................................................. 19

3.    Administrative Claims of Professionals. .................................. 19

4.    Non-Tax Priority Claims. ....................................................... 19

5.    Secured Claims. ..................................................................... 20

6.    503(b)(9) Claims. ................................................................... 20

7.    Tax Claims. ........................................................................... 21

8.    Other Priority Claims ............................................................ 21

IV. CURRENT FINANCIAL STATUS .............................................................. 21

A.    Assets .................................................................................... 21

B.    Liabilities. ............................................................................. 21

V. PLAN SUMMARY ..................................................................................... 22

A.    Specification and Treatment of Unclassified Claims ............................ 23

1.    Administrative Claims. ........................................................... 23

2.    Administrative Claim Bar Date ............................................... 23

3.    Claims for Professional Fees .................................................. 23

4.    Priority Tax Claims. ............................................................... 24

5.    Priority Employee Claims. ...................................................... 24

6.    Classification and Treatment of Claims and Interests under the Plan .......... 2

B.    Anticipated Distributions by Plan Administrator .................................. 30

C.    Miscellaneous Plan Provisions ............................................................ 31

VI. LIQUIDATION ANALYSIS ........................................................................ 34

VII. PROJECTED RECOVERY UNDER PLAN OF LIQUIDATION ............................ 35

VIII. FEDERAL INCOME TAX CONSEQUENCES ................................................................ 36

IX. CONCLUSION ........................................................................................................... 37

DISCLOSURE STATEMENT
ACCOMPANYING DEBTOR'S PLAN OF
LIQUIDATION (DATED: APRIL 16, 2013)

# I.

## INTRODUCTION AND PURPOSE OF DISCLOSURE STATEMENT

Zacky Farms, LLC (the "Debtor" or "Zacky Farms") filed its voluntary Chapter 11 petition on October 8, 2012.  The Debtor (the "Proponent") has proposed a Plan of Liquidation (the "Plan"), a copy of which is furnished with this Disclosure Statement Accompanying Plan of Liquidation (the "Disclosure Statement").  The primary features of the Plan provide for the continued liquidation of Estate Assets[1] and distribution of the proceeds after Plan Confirmation in accordance with existing Court-approved settlements and the Bankruptcy Code Distribution Priorities.

The purpose of this Disclosure Statement is to provide Creditors and Interest holders with sufficient information to allow them to make a reasonable, informed decision on whether to accept the Plan.  Pursuant to the requirements of the Bankruptcy Code, this Disclosure Statement has been presented to and approved by the Court as containing adequate information.  Approval of this Disclosure Statement by the Court does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered by the Plan.

The Debtor through its management and/or its consultants has provided the information contained in this Disclosure Statement with the goal to disclose adequate information which, in the opinion of the Debtor's management, is material, important and necessary to an evaluation of this Plan.  The material contained in this Disclosure Statement is intended solely for that purpose and solely for the use of known Creditors and, accordingly, may not be relied upon for any purpose other than the determination of how to vote on the Plan.

A Creditor, in order to vote on the Plan, must have filed a proof of Claim or proof of Interest before the deadlines established by the Court, except in those instances where the schedules reflect that the Claim was neither disputed, unliquidated nor contingent.  Any Creditor scheduled as neither disputed, unliquidated nor contingent is, to the extent scheduled, deemed to have filed a Claim and, absent objection, such Claim is deemed allowed.  For voting purposes,

---

[1]  Capitalized terms shall have the meanings defined herein or as in Article 1 of the Plan, or if not defined in the Plan or in this Disclosure Statement, as defined in 11 U.S.C. § 101 *et seq.*

Creditors who wish to vote on the Plan should review this Disclosure Statement and the Plan, should complete the ballot furnished with this Disclosure Statement and Plan, and return the ballot to attorneys for the Committee, Felderstein Fitzgerald Willoughby & Pascuzzi, LLP, Attention:  Karen Widder, 400 Capitol Mall, Suite 1750, Sacramento, California, 95814-4417.

As a holder of a Claim or Interest against the Debtor, your vote on the Plan is important. In order for the Plan to be confirmed by the Court pursuant to Bankruptcy Code § 1129(a), the holders of two-thirds (2/3) in the amount and one-half (1/2) in number of each impaired class of Claims must vote or be deemed to have voted for acceptance and the holders of at least two-thirds (2/3) in amount of each impaired class of Interests must vote or be deemed to have voted to accept the Plan.  If an impaired class of Claims or Interests does not accept the Plan, it may nevertheless be confirmed if the Court determines that the Plan otherwise satisfies the requirements of Bankruptcy Code § 1129(a), does not discriminate unfairly, and is otherwise fair and equitable within the meaning of Bankruptcy Code § 1129(b).  If appropriate, the Proponent will seek confirmation under these provisions.

Whether a Creditor or Interest Holder votes on the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of classes of Creditors and Interest Holders and/or is otherwise confirmed by the Court.  Holders of Claims or Interests who fail to vote may be deemed to have voted to accept the Plan. Allowance of a Claim or Interest for voting purposes does not necessarily mean that the Claim or Interest will be allowed for purposes of distribution under the Plan.

No representations concerning the Debtor or the value of the Debtor's property are authorized other than as set forth in this Disclosure Statement.

Creditors are encouraged to review the Disclosure Statement and Plan carefully before deciding how to vote.

Certain of the material contained in this Disclosure Statement is taken directly from readily accessible documents or constitutes a digest of other documents, on file with the Court in the Case. Copies of all the pleadings on file in the Case can be accessed via the Court's document retrieval program (i.e. the Pacer system), which may be accessed at the following webpage:

DISCLOSURE STATEMENT
ACCOMPANYING DEBTOR'S PLAN OF
LIQUIDATION (DATED: APRIL 16, 2013)

https://ecf.caeb.uscourts.gov/cgi-bin/login.pl (registration for service required, and fees for document retrieval). Copies of documents filed with the Court may also be found at: http://www.kccllc.net/Zacky for no charge.  While the Proponent, has made every effort to retain the meaning of such other documents or portions, transposed or paraphrased from the Court's records, the Proponent urges that any reliance on the contents of other documents filed with the Court should depend on a thorough review of the documents themselves.  Moreover, the complicated affairs of the Debtor make it impossible to warrant that all information contained herein is complete and accurate.  Every reasonable effort has been made to present correct and accurate figures and information.

## II.

## HISTORY AND NATURE OF THE DEBTOR'S BUSINESS

### A.      Overview

The Debtor was founded in 1928 with the opening of Sam's Poultry Market in Los Angeles.  Over the next 84 years, the Debtor expanded to become one of the large vertically integrated poultry processors in the United States.

The Debtor's gross sales were $142 million in 2010 and $146 million in 2011.  As of the Petition Date, he Debtor employed approximately 1,000 employees and operated in multiple plants, farms and offices in California, including operations in Los Angeles, Fresno, Tulare, Kings, San Joaquin and San Bernardino Counties.

### B.      Prepetition Efforts to Avoid Bankruptcy

One of the crucial problems facing the Debtor prior to this filing was the recent volatility in the price for corn and other commodities, which seriously impacted Zacky Farms' liquidity position.  Profitability in the poultry industry is materially affected by the commodity prices of feed ingredients.  The cost of corn and soybean meal, the Debtor's primary feed ingredients, increased significantly in early 2008 as a result of, among other things, increasing demand for these products because of the passage of the Energy Independence and Security Act of 2007 ("EISA").  The EISA established annual minimum requirements for an increase in the production of biofuels, including ethanol (which is primarily made from corn), from nine billion gallons in

2008 to sixteen billion gallons by 2022. As a result, the demand for, and price of, corn increased significantly. Prior to the EISA, the price of corn ranged from between $2.00 and $3.25 per bushel. After EISA, corn prices reached a high of $7.65 per bushel in June 2008, and then dropped to approximately $3.50 per bushel on average for 2009 and increased to an average of approximately $6.25 per bushel in 2011.

A severe drought in 2012 exacerbated the situation and corn prices increased to between $7.00 and $8.00 per bushel for most of 2012. In addition to the rise in corn prices, the price of soybean meal rose from approximately $300 per ton on average in 2010 and 2011 to a price as of the Petition Date of approximately $500 per ton.

The liquidity crisis that caused the bankruptcy filing was also impacted by the seasonal nature of turkey sales. The great bulk of turkey sales occur around the Thanksgiving holiday period. Vertically integrated turkey growers require a significantly greater amount of cash for the feed and care of the birds grown to meet consumer demands for the Thanksgiving holiday. Zacky Farms prior to its bankruptcy filing was expending approximately $1.8 million per week on feed for its approximately 1.9 million turkeys and 600,000 chickens.

Zacky Farms first addressed this cash flow crisis by obtaining stop gap financing from two family trusts which in aggregate own approximately 67% of Zacky Farms.

Between April 2012 and the Petition Date, the Robert D. Zacky and Lillian D. Zacky Trust U/D/T Dated July 26, 1988 (the "DIP Lender"), which owns 50% of Zacky Farms, and the Lillian D. Zacky Trust dated July 26, 1988 (the "Lillian Zacky Trust"), advanced $7 million as short-term loans to Zacky Farms. The DIP Lender advanced an initial $3 million on April 25, 2012 and another $1 million was advanced on May 18, 2012. Both of these advances were on an unsecured basis. The Lillian Zacky Trust advanced $500,000 on September 7, 2012; another $500,000 on September 17, 2012, and then $2 million on September 28, 2012. The loans made in September 2012 were secured by real estate collateral owned by Zacky Farms.

Between September 7, 2012 and the filing, the Richard N. Zacky Irrevocable Trust dated November 25, 2007 (the "Richard Zacky Trust"), which owns 16.605833% of Zacky Farms, advanced the sum of $500,000 on September 7, 2012 and another $500,000 on September 17,

2012.  Both loans were secured by real estate collateral owned by Zacky Farms (the secured loans made by the Lillian Zacky Trust and the Richard Zacky Trust in September of 2012 are collectively referred to as the "Prepetition Bridge Liens").

Unfortunately, the owner  bridge loans were insufficient in fully bridging the cash flow gap until the Thanksgiving sales produced a positive cash flow.

Concurrent with the liquidity crisis, the Zacky families were negotiating reciprocal buyouts whereby certain members of the extended family of Robert Zacky (deceased) would buy out the 50% interest in Zacky Farms owned by the extended family of Albert Zacky (deceased), and correspondingly certain members of the extended family of Albert Zacky would buy out the 50% interest of Integrated Grain and Milling, Inc. ("IGM") owned by the extended family of Robert Zacky.  On or about September 8, 2012, the owners of the Debtor executed an amendment to the Zacky Farms operating agreement that approved the appointment of Keith Cooper of FTI Consulting, Inc. ("FTI") as the sole manager and the CRO in the event a buyout had not been completed by September 18, 2012.

As the cash crisis deepened, and with no buyout agreement among the family ownership groups, it became impossible to obtain additional financing from either side of the Zacky family. The DIP Lender, however, agreed to extend additional secured financing on the terms and conditions of a debtor in possession ("DIP") credit facility (the "DIP Facility") if the DIP Lender was able to obtain all the protections of a DIP financing order.

**C.**     **The Debtor's Pre-Petition Credit Facility**

On or about October 13, 2009, Zacky Farms entered into a revolving credit facility with Wells Fargo Bank, N.A. ("Wells Fargo") in the amount of $55 million that included a continuing security agreement in Zacky Farms' inventory and equipment, and a third-party security agreement (the "Original Credit Facility").  The DIP Lender was a surety for the Original Credit Facility and pledged collateral for the Original Credit Facility under the terms of the third-party security agreement.  Wells Fargo perfected its security interest in assets of Zacky Farms by recording a UCC-1 financing statement on November 17, 2009 (the "Wells Fargo Lien").

In July 2011, Zacky Farms obtained additional financing in the amount of $6 million,

1    increasing the total facility with Wells Fargo to $61 million.  The Wells Fargo indebtedness was

2    extended and modified in various amendments, which extended the facility deadline through

3    July 15, 2012.  The Wells Fargo obligations under the Original Credit Facility, and as expanded

4    and extended, became fully due and payable on July 15, 2012.

5            Wells Fargo served a notice of default letter to Zacky Farms on October 3, 2012

6    demanding payment in full of the Wells Fargo indebtedness. The DIP Lender negotiated a

7    purchase of the Original Credit Facility from Wells Fargo and, on October 5, 2012, the DIP

8    Lender purchased the Original Credit Facility from Wells Fargo.

9            **D.**      **Preparations for a Bankruptcy Filing**

10            FTI began its onsite review of the business operations on September 18, 2012.  FTI

11    assisted Zacky Farms' management in the development of a detailed 13-week cash flow to

12    determine the cash needs of the Debtor through the end of 2012.  Additionally, FTI held initial

13    discussions with senior management and the sales organization to begin an assessment of

14    potential strategic alternatives and restructuring or sale opportunities.  Finally, FTI assisted the

15    Debtor in seeking financing alternatives and eventually the preparation of its chapter 11

16    bankruptcy filing. In retaining counsel, the Debtor, through its two Managers, Mr. Richard Zacky

17    and Mr. Scott Zacky interviewed several law firms to represent the Debtor in its bankruptcy case

18    and ultimately engaged Felderstein Fitzgerald Willoughby & Pascuzzi, LLP as its general

19    bankruptcy counsel.

20                            **III.**

21                    **POST-PETITION EVENTS**

22    **A.**      **Ongoing Business Operation and Approval of DIP Facility.**

23            As described above, the DIP Lender was the primary pre-petition owner of the Debtor

24    who advanced funds to continue the Debtor's operations during the summer of 2012.  As a

25    condition to making the DIP Facility, all collections of cash collateral that were collateral for the

26    Original Credit Facility were required to be used to pay down the obligations owed under the

27    Original Credit Facility only.

28            The DIP Facility was secured by all of the Debtor's assets including its real estate assets,

DISCLOSURE STATEMENT
ACCOMPANYING DEBTOR'S PLAN OF
LIQUIDATION (DATED: APRIL 16, 2013)

which were not originally collateral for the Original Credit Facility.  The Prepetition Bridge Liens were permitted to remain senior to the DIP Facility's liens on the applicable real estate.  The DIP Facility liens primed the liens securing the Original Credit Facility.

Below is a chart detailing the general terms of the DIP Facility:

| Loan Provision | Description |
|---|---|
| DIP Facility Ceiling | $71,000,000 |
| Term | From entry of interim order through January 31, 2013[2] |
| Interest Rate | 6.00% per annum |
| Costs | All out of pocket costs, fees and expenses |
| Fees | There were multiple fees and costs, including a front-end fee of $500,000 and a collateral monitoring fee of $25,000 per month |
| Liens | First priority liens on all pre and post-petition assets of the debtor subject to Prepetition Bridge Liens and another minor lien, defined below ("Senior Secured Debt") |
| Priming | The DIP Facility primed all secured claims except the Senior Secured Debt and certain other minor liens. |
| Sale Process | The Debtor was required to immediately commence a sale process to sell the Debtor's assets as a going concern |

As described below, there were significant negotiations amongst the Debtor, the Committee and the DIP Lender respecting approval of the DIP Facility and the treatment and payment of 503(b)(9) Claims and Unsecured Creditors in the case. When no settlement was reached, the Committee pressed its objection to approval of the DIP Facility. The Court overruled the objection, and the final Order approving the DIP Facility was entered on the Court's docket on November 13, 2012 (Docket No. 292).    The Committee subsequently filed a notice of appeal, which appeal has since been essentially resolved with the approval of the DIP Lender Settlement. The Committee's appeal has been stayed pending a resolution of the Richard Zacky Entities' appeal of the DIP Lender Settlement Order.

///

---

[2]  Subsequently amended to March 1, 2013.

**B.**     **Retention of Imperial Capital.**

The DIP Facility required the Debtor to commence an immediate sale process to sell the Debtor's assets as a going concern.  To facilitate this process, the Debtor interviewed multiple investment bank candidates and, after consultation with the Committee, Richard Zacky, and the DIP Lender, the Debtor selected Imperial Capital, LLC ("Imperial Capital").

Imperial Capital is a full service investment banking firm focused on providing financial advising and capital raising services.  Specifically, Imperial Capital offered a diverse range of products and services, including, without limitation:  investment banking and financial advisory services, institutional equity research, sales and trading, fixed income services and broker dealer services.  Imperial Capital's Restructuring Group also had significant experience in recapitalization and restructuring transactions, including engagements involving in- and out-of-court restructuring, chapter 11 reorganizations, company, creditor and board advisory services, and distressed asset sales.

As the Debtor's investment banker, Imperial Capital developed significant institutional knowledge about the Debtor's operations and provided a variety of critical investment banking services to the Debtor.  These services included, but were not limited to, providing advice regarding sale process strategy, bidder negotiations and running a competitive and comprehensive public sale process.  Since November 2012, Imperial Capital made numerous visits to the Debtor's facilities, participated in site tours and other on-site diligence and held numerous diligence calls with the Debtor's management during which the Debtor's operations, historical performance and financial projections, among other items, were discussed.

**C.**     **Zacky Farms Sales Procedures.**

Concurrently with the selection of Imperial Capital, the Debtor obtained approval for a Sale Procedures Order, which set the timeline for the marketing and auction sale of substantially all the assets of the Debtor.

The Sale Procedures Order's timeline was as follows:  (i) from retention, Imperial Capital was to solicit interest from potential bidders, and assist them in conducting their respective due diligence investigations; (ii) qualified bids were to be accepted through January 10, 2013; (iii) an

out of Court auction was conducted on January 15, 2013; and (iv) present the successful bidder at the auction to the Court for approval at a final sale hearing on January 18, 2013.

      **D.**      **Marketing and Auction Sale of Zacky Farms Operating Assets.**

Imperial Capital worked with the Debtor's management to produce a confidential information memorandum which was delivered to potential purchasers in conjunction with the sale process.  Imperial Capital further assisted the Debtor with populating a comprehensive data room, the contents of which were available to potential purchasers.  Imperial Capital communicated at length with various potential purchasers to coordinate and facilitate due diligence activities and to communicate the bidding process and logistics.  Imperial Capital also participated in on-site management presentations and other informational meetings and calls, which were attended by potential bidders.

Through the course of its engagement, Imperial Capital evaluated bids received from potential buyers and synthesized its analyses of those bids for presentation to the Debtor. Imperial Capital prepared presentations and participated in discussions with the Debtor's senior management as well as various parties in interest (including the Committee) regarding the Debtor's operations, financial projections and updates on the sale process.  Imperial Capital helped the Debtor to determine the optimal bidder after evaluating proposals from various parties that were interested in acquiring the Debtor's assets.

Three qualifying bids were received on January 10, 2013, in accordance with the Sale Procedures Order:  (a) a bid by the DIP Lender, (b) a bid by Pitman Family Farms, and (c) a bid by Foster Poultry Farms d/b/a Foster Farms.  The initial highest and best bid was determined to be a modified bid by the DIP Lender in the amount of a cash and credit bid at $31.6 million, as set forth in an asset purchase agreement.

The Auction was held on January 15, 2013, at the Offices of Munger Tolles & Olson, 560 Mission Street, 27th Floor, San Francisco, California.  No bidder chose to increase its bid above the DIP Lender's modified bid.

      **E.**      **DIP Lender Lien Challenge Investigation.**

An additional provision of the DIP Facility documentation charged the Committee with

the responsibility to conduct an investigation into the DIP Lender's loan and lien documents. In furtherance of its responsibilities, the Committee conducted discovery to analyze the validity of certain liens formerly held by Wells Fargo, which were acquired by the DIP Lender on the eve of the bankruptcy filing, as well to investigate certain actions undertaken by the Debtor's insiders. In connection with such discovery, the Committee filed applications seeking orders requiring the Debtor and certain third parties to appear for oral examination and to produce documents under Bankruptcy Rule 2004. The Court granted the applications (the "2004 Exam Orders").

Pursuant to the 2004 Exam Orders, the Debtor, the DIP Lender (through Lillian Zacky), and Wells Fargo were required to produce, and the Committee reviewed, a substantial volume of documents. Additionally, the Committee conducted oral examinations of Lillian Zacky and the Debtor's chief financial officer, Kirk VanderGeest, as well as Carlo Serafini of Wells Fargo.

On January 11, 2013, the Committee filed its "Response and Limited Objection to Debtor's Motion for Authority to Sell Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to Section 363 of the Bankruptcy Code" (the "Committee Sale Objection"). The Committee objected to the DIP Lender credit bidding its prepetition secured claim at the Auction, a substantial portion of which has been "rolled up" into its DIP Facility over the course of the case, asserting that the Committee had filed an objection to the DIP Lender's secured claim and that section 363(k) of the Bankruptcy Code precluded such a credit bid because the DIP Lender did not have an Allowed Secured Claim as required by section 363(k). The Committee requested that the Court, if inclined to permit a credit bid from the DIP Lender, impose certain conditions on any such credit bid to protect the Committee's lien challenge rights and to preserve the benefit of those claims for creditors of the estate. The Committee further objected to the proposed sale to the DIP Lender because the Debtor had not provided a mechanism for the payment of administrative claims (including allowed 503(b)(9) Claims). The Committee objected to the payment of the net proceeds of a sale, if the purchaser was a Third Party (other than the DIP Lender) in light of the Committee's motion seeking standing to challenge the characterization of, the extent and/or the validity of the DIP Lender's liens and Claim.

Concurrent with the Committee Sale Objection, the Committee filed a motion seeking standing to prosecute certain causes of action on behalf of Estate, which described the investigation summarized above and attached as an exhibit a draft adversary complaint (the "Complaint") setting forth causes of action against the Lillian Entities and the Richard and Sharon Zacky Entities: (a) to recharacterize the certain Claims as equity Interests; (b) to recover transfers as fraudulent conveyances; (c) for breach of fiduciary duty; (d) for aiding and abetting breach of fiduciary duty; and (e) objecting to certain Claims under section 502 of the Bankruptcy Code.  The Committee also asserts that its investigation of the Richard and Sharon Zacky Entities is not complete, as the initial lien challenge investigation was focused on the DIP Lender, and other known or unknown causes of action may subsequently be added to any actual litigation that is filed.

The Debtor is informed and believed that the Richard and Sharon Zacky Entities vehemently dispute the Committee's allegations.  Certain of the Richard and Sharon Zacky Entities objected to approval of both the settlement with the DIP Lender ("DIP Lender Settlement") and the Zacky Farms Sale, and have appealed the entry of the DIP Lender Settlement Order.

**F.      DIP Lender Settlement Negotiations and 503(b)(9) Negotiations**

Even before entry of the DIP Facility Order, the Debtor, the Committee and the DIP Lender conducted extensive settlement negotiations respecting the treatment of the Allowed Unsecured Claims and the 503(b)(9) Claims in the case.  The Debtor had negotiated the inclusion of a $6.4 million dollar amount in the proposed DIP Facility budget prior to the bankruptcy filing for the payment of 503(b)(9) Claims, and the DIP Lender indicated from the filing date that it was amenable to providing for payment of the 503(b)(9) Claims as well as a material distribution to Allowed Unsecured Claims if a settlement could be reached.

Unfortunately, though the parties were extremely close to a settlement on the eve of the final hearing on approval of the DIP Facility, no final settlement was reached at that time.

The Committee then propounded written discovery and set multiple Rule 2004 examinations described above.  Once that discovery was concluded, additional and extensive

settlement discussions followed, but again, though extremely close, a deal could not be finalized, even after several extensions of the deadline to file a lien challenge action.

Negotiations continued on the day before the Auction, into the evening and night before the Auction, and throughout the day of the Auction. Again, while no settlement was reached, the basic framework remained – a $6.4 million amount to pay 503(b)(9) Claims and a defined amount that would provide for a material distribution to the holders of Allowed Unsecured Claims.

### G.    Post-Auction Sale and DIP Lender Hearings.

What followed the Auction was a string of sale and settlement hearings with some unexpected twists and turns.

### 1.    January 18, 2013 Hearing

After the Auction, but before the sale hearing on Friday, January 18, 2013, and in a departure from the provisions of the Sales Procedures Order, Pitman Family Farms increased its bid to $32.1 million, which was $500,000 more than the DIP Lender's credit bid.

However, on the eve of the January 18, 2013 hearing, the Committee, the Debtor, and the DIP Lender finally reached a settlement of all disputed issues among them – payment of 503(b)(9) Claims via a $6.4 million secured, a material payment to Allowed Unsecured Claims via a $3 million secured note, resolution of the appeal of the DIP Facility order, funds to pay for the cost of administration of the Chapter 11 Case through the Effective Date of a Plan, and resolution of the lien challenge as to the Lillian Entities. This settlement was reduced to writing in a term sheet that was summarized on the record at the January 18, 2013 sale hearing.

After consultation with Imperial Bank and the Committee, the Debtor concluded that the proposed sale to the DIP Lender, when combined with the benefits of the settlement as set forth in the term sheet, was vastly superior to the Pitman Family Farms' increased bid. Pitman Family Farms was designated the backup bidder on the record, and the sale hearing was continued to January 28, 2013, to allow a hearing to approve the settlement to be held at the same time as the final sale hearing.

///

///

2. **DIP Lender Withdrawal from the Sale Process and Acceptance of Pitman Backup Bid**

After negotiating through the weekend on the form of the final documentation to replace the term sheet, counsel for all parties agreed in concept to a settlement order, amended asset purchase agreement and other documents (the "1/23/2013 Final Settlement Documentation") late Tuesday night, January 22, 2013.  Counsel for the Committee and the DIP Lender agreed to obtain approval from their respective clients on the morning of January 23, 2013.

In the afternoon of January 23, the DIP Lender informed the Debtor that the DIP Lender (after reviewing all the provisions of the 1/23/2013 Settlement Documentation) decided it would not go forward with the purchase and preferred that the Debtor proceed with the Pitman Family Farms backup bid.

In an effort to mitigate its damages from the DIP Lender withdrawing from the sale process, in the late afternoon of January 23, 2013, the Debtor executed and approved Pitman Family Farms' backup bid, and began the process of moving forward to close a sale under the terms of the Pitman Family Farms backup bid.

3. **January 28, 2013 Hearing**

The hearing on January 28, 2013 became a status conference on the approval of the Pitman Family Farms backup bid.  The Court separated out the motion to approve the settlement with the DIP Lender (FWP-25) from the motion to approve the proposed sale to the Pitman Family Farms (FWP-22) with those two motions to proceed on separate tracks.  The Court set February 6, 2013, as the date for the hearing to consider the sale of the Debtor's assets to Pitman Family Farms.

4. **February 6, 2013 Hearing**

During the late afternoon of February 5, 2013, after changing counsel, the DIP Lender informed the Debtor that it might submit an overbid at the February 6, 2013, hearing, and subsequently increased its bid by $500,000.  In the minutes before the continued sale hearing on February 6, 2013, the Debtor, the Committee, and the DIP Lender drafted and then executed a two page "Amendment of Settlement Order" which attached and amended the 1/22/2013

1   Settlement Documentation, which is the settlement that became and is defined in the Plan as the

2   "DIP Lender Settlement."

3        At the February 6 hearing, the Debtor once again informed the Court that when the

4   proposed cash and credit bid sale to the DIP Lender was connected to the proposed settlement

5   with the DIP Lender, the DIP Lenders overbid was substantially more valuable than the backup

6   Pitman Family Farms offer.  The Committee agreed with that analysis on the record. Pitman

7   Family Farms objected.  As such, the Court reconnected the proposed DIP Lender Settlement

8   with the proposed sale to the DIP Lender, and set a hearing for February 20, 2013 to consider

9   both motions.

10       **5.      February 20, 2013 Hearing**

11       At the February 20, 2013, hearing, the Court overruled various objections, including

12  multiple objections raised by some of the Richard Zacky Entities, and approved both the proposed

13  sale to the DIP Lender and the DIP Lender Settlement.  Pitman Family Farms was once again

14  approved as a backup bidder on a portion of the assets to be sold in case the DIP Lender failed to

15  close.

16       **6.      February 26-28, 2013 Closing**

17       Under the DIP Lender APA, the sale to the DIP Lender was to close on February 22,

18  2013.  On or about February 22, 2013, the Debtor, after consultation with the Committee

19  extended the closing date for the sale to February 26, 2013.  On February 26, 2013, as part of the

20  closing, all employees were terminated by the Debtor.  The next day, February 27, 2013, the vast

21  majority of those employees were offered positions with, and commenced working for, the

22  assignee of the DIP Lender, Zacky and Sons, LLC.  The DIP Lender's wire for the cash portion of

23  the purchase price was actually received by wire transfer on February 27, 2013, and the transfer

24  documents were recorded on February 28, 2013.

25  **H.     Potential Litigation.**

26       **1.   Potential Litigation Against Richard and Sharon Zacky Entities.**

27       As described above, after investigating the relationship between the Debtor and its

28  affiliates, including inter-company obligations, the Committee has asserted that it has significant

claims against the Richard and Sharon Zacky Entities, and possibly against other insiders, other than those that were released as part of the DIP Lender settlement. All affirmative claims against such persons or entities shall be reserved and brought or resolved prior to the Effective Date by the Committee or after the Effective Date by the Plan Administrator, who will also succeed to any claims, proceedings, motions or actions filed prior to the Effective Date. The claims against the Richard and Sharon Zacky Entities include, but are not limited to, the Claims asserted by the Committee in the Complaint filed by the Committee (which Complaint shall be and hereby is incorporated herein by reference) on January 11, 2013. Without limitation, the Committee prior to the Effective Date, or the Plan Administrator after the Effective Date, intend to bring affirmative causes of action against the Richard and Sharon Zacky Entities related to the Richard and Sharon Zacky Entities' receipt of millions of dollars in payments from the Debtor prior to the petition date, receipt of liens on and security interests in the Debtor's previously unencumbered assets, and other misconduct related to the Debtor. The Debtor understands that the causes of action that will be asserted against the Richard and Sharon Zacky Entities will be based on, inter alia, fraudulent and preference law for the avoidance and recovery of payments received, recharacterization and subordination of claims filed by the Richard and Sharon Zacky Entities against the Estate, breaches of fiduciary duties and aiding and abetting in the breaches of fiduciary duties, breaches of the covenant of good faith and fair dealing, improvident lending, and deepening insolvency.

## 2. Avoidance Litigation.

Pursuant to the DIP Lender Settlement Order, all avoidance actions under Chapter 5 of the Bankruptcy Code against non-insiders, except the DIP Lender and certain "Lillian Entities" and the as defined in the DIP Lender Settlement Order and the Richard and Sharon Zacky Entities, were waived except for those against the holders of 503(b)(9) Claims who do not elect to participate in the 503(b)(9) Settlement. The Debtor believes that to the extent transfers were made during the applicable 90 day (non-insiders) or one year (insiders) period prior to the filing, potential preference actions exist against such parties. As to non-settling creditors who hold 503(b)(9) claims, the Debtor believes that in the Ninth Circuit, a creditor cannot "double dip" and

gain the benefit of the new value defense and allowance of a 503(b)(9) claim. With respect to

insiders, as set forth above, the Committee is investigating multiple potential causes of actions for

the avoidance and recovery of payments received by the Richard and Sharon Zacky Entities,

including but not limited to potential constructive fraudulent or intentional conveyance claims

under state and/or federal law, and other claims as set forth above. The time period being

investigated is governed by the applicable state law and/or federal statutes of limitations and both

statutes are subject to tolling until creditor discovery of the potential claim. The Committee and

the Estate reserves such claims to the fullest possible extent to bring any and all claims against

third parties, including but not limited those set forth in the Claim, and ma bring them before or

prior to the Effective Date.  Any and all such claims are preserved and shall be vested in the

Liquidating Debtor as of the Effective Date.

### 3.        Retention of Jurisdiction and Other Claims

As of the Effective Date, described in this Disclosure Statement and each and every claim,

right, cause of action, claim for relief, right to set-off and other entitlement held by the Debtor

whether arising under §§ 502, 506, 510, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551,

552 or 553 of the Code as well as any avoidance actions or other actions under applicable state

law, or otherwise, other than those waived or released by prior Orders including the DIP Lender

Settlement Order, by the express terms of the Plan or the Confirmation Order, shall be deemed

fully preserved and vested in the Liquidating Debtor.

Without limiting the generality of the foregoing, any and all claims and causes of action

held by the Debtor, the Debtor in Possession and/or the Committee prior to the Effective Date

against any person or entity, including, but not limited, to the Richard and Sharon Zacky Entities,

and any accounts receivable actions retained by the Liquidating Debtor and excluded from the

Zacky Farms Sale, as well as any other possible retained affirmative claims against Third Parties,

shall be retained by the Liquidating Debtor.  Such claims shall include but not be limited to any

claims based on the facts and circumstances related in any way to the dissolution of the Debtor,

and all avoidance actions for transfers made by the Debtors or any affiliates, including all claims,

rights to recovery, or transfers disclosed in the statement of financial affairs filed with the Court

by the Debtor.

Confirmation of the Plan effects no settlement, compromise, waiver, or release of any cause of action previously approved by the Court unless the Plan or Confirmation Order specifically and unambiguously so provides.

The non-disclosure or non-discussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.  The Debtor and Liquidating Debtor also reserve the right to object to any of the Claims (regardless of whether the Claim was actually filed and classified as an Unsecured, Administrative, Priority or Secured Claim or Interest) improperly asserted against the Debtor and the Estate.

As stated above, however, under the Plan all retained claims and defenses of any kind and nature shall revest in the Liquidating Debtor on the Effective Date, including any Chapter 5 avoidance actions not previously released in the DIP Lender Settlement Order.

**I.      Appointment of Creditors' Committee.**

On October 16, 2012, the United States Trustee filed its Appointment of Unsecured Creditors Committee appointing Western Milling, LLC,  Foster Farms, LLC & Foster Poultry Farms, Associated Feed & Supply, Sealed Air Corporation (Cryovac), Axis Media Management Inc., Gahvejian Enterprises, Inc. dba Mid Valley Packaging & Supply Co., and International Paper as members of the Official Committee of Unsecured Creditors (the "Initial Committee"). Since the appointment of the Initial Committee, the following Committee members have resigned: Foster Farms, LLC & Foster Poultry Farms and Gahvejian Enterprises, Inc. dba Mid Valley Packaging & Supply Co.

**J.      Appointment of Professionals**

**1.      Professionals of the Debtor**

On November 9, 2012, the Court entered its order authorizing the employment of Felderstein Fitzgerald Willoughby & Pascuzzi LLP as counsel for the Debtor, retroactive to October 8, 2012.  On November 15, 2012, the Court entered its order authorizing the employment of Imperial Capital as investment banker for the Debtor, retroactive to November 2, 2012.  On January 17, 2013, the Court entered its order authorizing the employment of King & Spalding as

special transaction counsel to the Debtor, retroactive to November 28, 2012.

**2.      Professionals of the Committee**

On November 9, 2012, the Court entered its order authorizing the employment of Lowenstein Sandler PC as counsel for the Committee, retroactive to October 18, 2012; Fox Rothschild LLP as local counsel for the Committee, retroactive to October 19, 2012; and CohnReznick LLP as financial advisor for the Committee, retroactive to October 22, 2012.

**3.      Appointment of Personnel Outside of Ordinary Course of Business under 11 U.S.C. § 363**

Pre-petition, the Debtor retained FTI to provide restructuring advisory services.  As part of those services, two FTI employees currently serve as officers of the Debtor.  Specifically, Keith F. Cooper is the Debtor's Sole Manager and Chief Restructuring Officer and Sean M. Harding is the Debtor's Senior Vice President of Restructuring.

Post-petition, on November 13, 2012, the Court entered its order authorizing the retention of Messrs. Cooper and Harding as the Debtor's officers and the employment of FTI, effective as of October 8, 2012.

Post-petition, the Debtor retained Kurtzman Carson Consultants, LLC ("KCC") to assist the Debtor in the completion of its bankruptcy schedules and statement of financial affairs, compile claims, create and maintain a public case-specific website, send various notices, notice plan solicitation and compile plan balloting.  On November 13, 2012, the Court entered its order authorizing the employment of KCC, effective as of October 10, 2012.

**K.      Claims Against the Estate.**

**1.      Prepetition Claims.**

Pursuant to the Bankruptcy Court's "Claims Register Summary" as of March 6, 2013, at 6:25 p.m., the total Claims filed are in the amount of $97,607,146.31.  This report indicates that of this amount $70,838,432.04 was filed on behalf of Secured Claims, and $4,305,303.49 on behalf of asserted Priority Claims.

The Debtor's schedules listed secured claims at $67,946,325.65, Priority Claims at $0, and General Unsecured Claims at $41,351,353.00.

**2.      Administrative Claims Other Than Professional Fees and 503(b)(9) Claims.**

As part of the DIP Lender Settlement, the DIP Lender assumed all ordinary course of business Administrative Claims, and the Debtor believes that all such Claims will be or have already been paid in full.

Foster Farms has also filed a proof of claim on February 5, 2013 (Claim# 409), which estimates $500,000 in post-petition damages as an administrative claim, and $1,000,000 estimated damages prior to the filing as a general unsecured claim, from an asserted trade mark infringement.  The Debtor disputes both liability and damages. Negotiations have commenced regarding this claim, but if the claim is not resolved consensually, litigation will be required to resolve this issue.

**3.      Administrative Claims of Professionals.**

Based on the information available as of the hearing on the Disclosure Statement, the total fees of Professionals paid and/or accrued from the Petition Date through February 28, 2013 is approximately $4,400,000.00.  As part of the DIP Lender Settlement, and on the close of the Zacky Farms Sale, the DIP Lender funded Cash to pay all anticipated Professional fees and projected Administrative Claims expenses from the closing of the Zacky Farms Sale through the Effective Date of the Plan.  Of this Cash, $400,000 is designated for Debtor's professional fees and expenses for this time period, and $433,000 is for the Committee professional fees and expenses for the same time period.  By agreement between the Debtor and the Committee, $100,000 of the Committee's professional fees has been allocated to bankruptcy-related work and $333,000 has been allocated to addressing and/or litigating the claims against the Richard and Sharon Zacky Entities. The Richard Zacky Objection asserts that the litigation with the Richard and Sharon Zacky Entities will be extremely complex, time-consuming, expensive, and "will" dissipate funds available to pay allowed unsecured claims.

**4.      Non-Tax Priority Claims.**

As part of the DIP Lender Settlement, the DIP Lender assumed all employee obligations, including all employee priority claims.  The Debtor believes that all such priority claims will be or have already been paid in full.  One employee, Mr. Richard Zacky, who was not hired by the

DIP Lender's assignee of the purchaser as part of the Zacky Farms Sale, had a Claim for vacation pay in excess of the section 507(a)(4) cap on such claims.  The Debtor has paid only the priority amount due and is treating the balance as an unsecured claim.  The Debtor does not believe that there will be any unpaid Priority Claims at the time of Confirmation.

### 5.    Secured Claims.

The two major secured claims of the estate were the DIP Lender's pre-petition secured claim in the amount of $67,444,227.15 (Claim no. 416-1) and the secured claim of Western Milling, LLC in the amount of $8,083,100.03 (Claim no. 386-1).  Both of these claims have been fully resolved pursuant to the DIP Lender Settlement.  Other than the Richard Zacky Trust Lien in the amount of $1 million, the Debtor estimates that the balance of the Disputed Secured Claims total less than $250,000.  The Debtor does not believe that any of the Disputed Secured Claims other than the Richard Zacky Trust Lien have any significant probability of becoming Allowed Secured Claims based on the review of such Claims to date, and as such, are not anticipated to receive any distributions under the Plan.

The Debtor cannot at this time estimate whether there will be any distribution on the Richard Zacky Trust Lien due the vagaries of litigation risk.

The allowance or disallowance of the Disputed Secured Claims, and the cost to eliminate such Claims will impact the projected to return to the Class 15 general Unsecured Creditors.  This Disclosure Statement presumes that cost to eliminate these claims will be relatively inexpensive.

The Richard and Sharon Zacky Entities vehemently dispute the Committee's potential claims and assert that they have no value.

### 6.    503(b)(9) Claims.

As part of the DIP Lender Settlement, the DIP Lender has executed a $6.4M 503(b)(9) Note, which is secured by real property sold to the DIP Lender's assignee as part of the Zacky Farms Sale.  As of the filing of this Disclosure Statement, a sufficient number of the holders of 503(b)(9) Claims have elected to accept the 75% 503(b)(9) Settlement as set forth in the DIP Lender Settlement Order so that the proceeds of the $6.4M 503(b)(9) Note will be sufficient to pay all Allowed 503(b)(9) Claims and all Settled 503(b)(9) Claims in full.

7.      **Tax Claims.**

Each Allowed Priority Tax Claim and any other tax claims, up to the aggregate amount of $500,000, have been assumed and shall be paid by the DIP Lender under the terms of the DIP Lender APA. The Debtor is a pass-through entity and does not believe there will be any tax claims in excess of this $500,000 amount.

8.      **Other Priority Claims**

The Debtor does not believe there are any other priority claims asserted in the Chapter 11 Bankruptcy Case that have not previously been assumed as part of the Zacky Farms Sale or paid by the Debtor pursuant to previous Court order.

**IV.**

**<u>CURRENT FINANCIAL STATUS</u>**

A.      **<u>Assets</u>.**

The Debtor currently held Cash from the Zacky Farms Sale in the amount of $2,274,433.49  as of April 16, 2013, which it believes will be sufficient to pay all remaining post-petition Administrative Claims of Estate compensated professionals  through the Effective Date. All ordinary course of business Administrative Claims have been assumed by the purchaser as part of the Zacky Farms Sale. Additionally, the DIP Lender Settlement Order contains significant additional obligations that are beneficial to the Estate.

The Debtor also holds the Secured Sale Notes totaling $9.9 million with which to pay the Allowed 503(b)(9) Claims and to fund a distribution to Allowed Unsecured Claims. Additionally, there may be litigation assets, most specifically claims against the Richard and Sharon Zacky Entities, which have not yet been quantified, and any claims under the DIP Lender Settlement Order to enforce the provisions of that agreement, including but not limited any obligations to pay administrator or priority claims of the Estate.

B.      **<u>Liabilities</u>.**

A summary of Priority, Secured, and Administrative Claims (including 503(b)(9) Claims) is set forth in Article III, section J above, and the Proponent believes that either (a) all such Claims have either been assumed or will be paid for by the DIP Lender or its assignee; (b) will be

paid from the proceeds of the $6.4M 503(b)(9) Note; or sufficient funds exist to pay such Claims.

While it is difficult at this time to determine with any precision the total amount of Allowed Unsecured Claims that will exist after the Claims objection process is complete, the Proponent presently projects that total Unsecured Claims exclusive of executory contract rejection Claims, DIP Lender and related entity claims, employee claims, and duplicate claims, currently filed or scheduled is approximately $34.5 million. To the extent that the Debtor assumes and assigns executory contracts as part of the Zacky Farms Sale process, which assumption and assumption process is ongoing as of the filing of this Disclosure Statement, such potential additional Claims could be limited significantly. The Debtor is in the midst of a claim objection review and the Debtor estimates that the amount of Allowed Unsecured Claims (including the Richard and Sharon Zacky Entities) will be approximately $32 million.

The final amount of Allowed Unsecured Claims, however, is largely dependent on the outcome of any litigation or settlement of the claims described herein involving the Richard and Sharon Zacky Entities, one of which, IGM, possesses an Unsecured Claim in excess of $17.5 million. To the extent that this Claim can be reclassified as Equity, the total pool of Allowed Unsecured Creditors would drop from its current estimated amount of approximately $32 million to $14.5M, which would more than double the eventual distribution to Class 15 General Unsecured Creditors.

If on the other hand, the litigation with the Richard and Sharon Zacky Entities is not successful, the Richard Zacky Objection asserts that the Richard Zacky Entities may seek to recover their attorneys' fees and costs, which may be allowed as an administrative claim, which, depending on the amount allowed, could significantly reduce the distribution to general unsecured creditors under this Plan.

## V.

## PLAN SUMMARY

The Plan accompanies this Disclosure Statement and should be read carefully and independently of this Disclosure Statement.  The following summary should not be exclusively relied on for voting purposes.

The Plan is designed to provide for the economic liquidation of the remaining assets of the Debtor and for the distribution of Cash held by the Debtor to Creditors in accordance with the Bankruptcy Code Distribution Priorities, which essentially provide for the distribution to Creditors and Interest holders pursuant to the following distribution waterfall:

1.  Allowed Secured Claims from the proceeds of their collateral or replacement collateral granted by the Bankruptcy Court;

2.  Allowed Administrative Claims;

3.  Allowed Priority Claims (with a priority scheme among the various types of priority claims);

4.  Allowed Unsecured Claims; and

5.  Allowed Interest Holders.

Confirmation of this Plan is not anticipated to result in any future business operations as the business assets and operations have all been sold.

**A.   <u>Specification and Treatment of Unclassified Claims</u>**

**1.   Administrative Claims.**

Each Allowed Administrative Claim, other than Professional Fees, shall be paid in full by the DIP Lender in the ordinary course of business under the terms of the DIP Lender APA and the DIP Lender Settlement Order. To the extent that the DIP Lender or its assignee fails to pay such Allowed Administrative Claims, the Liquidating Debtor, pursuant to the requirements in the Plan shall pay such claims. Should the DIP Lender or its assignee fail to pay such Administrative Claims in the ordinary course of business, the Debtor may seek to compel such payment under the DIP Lender APA and/or the DIP Lender Settlement Order.

**2.   Administrative Claim Bar Date.**

All requests for payment of Administrative Claims must be filed by the Administrative Claim Bar Date as defined in the Plan or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor or the Liquidating Debtor or from sharing in any distribution under the Plan.

**3.   Claims for Professional Fees.**

Each party seeking an award by the Bankruptcy Court of Professional Fees must also file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date. The Debtor anticipates that the funds it received from the DIP Lender on the close of the Zacky Farms Sale shall be sufficient to pay all such Professional Fees. Should these funds be insufficient, the DIP Lender and its assignee have additional obligations to pay administrative claims under the DIP Lender Settlement Order, and the Debtor may seek to compel compliance with the DIP Lender Settlement Order.

**4.      Priority Tax Claims.**

Each Allowed Priority Tax Claim and any other tax claims, up to the aggregate amount of $500,000, have been assumed and shall be paid by the DIP Lender under the terms of the DIP Lender APA, or by the Liquidating Debtor if such claims are not paid pursuant to the provisions of the Plan.

**5.      Priority Employee Claims**.

All Allowed Priority Employee Claims were assumed by the DIP Lender under the terms of the DIP Lender APA and have previously been paid or satisfied by such assumption.  Any amounts unpaid by the DIP Lender, shall be paid by the Liquidating Debtor pursuant to various provisions of the Plan.

**6.      Classification and Treatment of Claims and Interests under the Plan.**

All Classes below are impaired under the Plan. Below is a table setting forth the treatments for each class of creditors:

/// 
/// 
/// 
/// 
/// 
/// 
///

| Class | Treatment |
|---|---|
| **Class 1 Claims (DIP Lender)** | The DIP Lender shall be treated pursuant to the terms provided in the DIP Lender Settlement Order, the Zacky Farms Sale Order and the Zacky Farms APA, which are incorporated by reference into this Plan treatment of Class 1 Claims as if restated fully herein. No distributions shall be made to the DIP Lender except as required to return carved-out funds pursuant to the terms of the DIP Lender Settlement Order.  The DIP Lender shall remain fully responsible for and liable for all obligations and amounts due the Debtor and/or any Creditors under the DIP Lender Settlement Order, the Zacky Farms Sale Order, the $6.4M 503(b)(9) Note and the $3.5M Creditor Note as well as any other documentation executed in connection with these orders and documents. To the extent that the DIP Lender's Liens have not been previously expunged from the Estate Assets, any and all remaining Liens of the DIP Lender on any Estate Assets shall be invalid, void and expunged on the Effective Date. |
| **Class 2 Claims (Western Milling)** | Western Milling's secured claim shall be treated pursuant to the terms provided in the DIP Lender Settlement Order. To the extent that Western Milling's Liens have not been previously expunged from the Estate Assets, any and all remaining Liens of Western Milling on any Estate Assets shall be deemed invalid, void and expunged from all the Estate Assets on the Effective Date.  Western Milling shall be entitled to receive distributions on account of its Settled 503(b)(9) Claim and its unsecured claim as part of distributions to Class 14 and 15 Claimants and as set forth in the DIP Lender Settlement Order. |
| **Class 3 Claims (Dreisbach)** | Dreisbach's Disputed Secured Claim shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of Dreisbach's Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to Dreisbach on account of its Disputed Secured Claim and the disputed Lien of Dreisbach on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.3(a) has not been obtained by the Confirmation Date, Dreisbach's Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to Dreisbach's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |
| **Class 4 Claims (Lillian Zacky Trust)** | The Lillian Zacky Trust shall receive no Plan distributions pursuant to the terms of the DIP Lender Settlement Order and the Zacky Farms Sale Order.  To the extent that the Lillian Zacky Trust's Liens have not been previously expunged from the Estate Assets, any and all remaining Liens of the Lillian Zacky Trust on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. |

| Class | Treatment |
|---|---|
| **Class 5 Claims (Office Max North America)** | Office Max North America's Disputed Secured Claim shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of Office Max North America's Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to Office Max North America on account of its Disputed Secured Claim and the disputed Lien of Office Max North America on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.5(a) has not been obtained by the Confirmation Date, Office Max North America's Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to Office Max North America's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |
| **Class 6 Claims (Dave Dodge Service, Inc.)** | Dave Dodge Service, Inc.'s Disputed Secured Claim shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of Dave Dodge Service, Inc.'s Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to Dave Dodge Service, Inc. on account of its Disputed Secured Claim and the disputed Lien of Dave Dodge Service, Inc. on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.5(a) has not been obtained by the Confirmation Date, Dave Dodge Service, Inc.'s Disputed Secred Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to Dave Dodge Service, Inc.'s Disputed Secured Claim and may resolve said claim pursuant to the Plan. |

| Class | Treatment |
|---|---|
| **Class 7 Claims (B&B Quality Food Providers)** | B&B Quality Food Providers' Disputed Secured Claim shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of B&B Quality Food Providers' Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to B&B Quality Food Providers' on account of its Disputed Secured Claim and the disputed Lien of B&B Quality Food Providers' on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.7(a) has not been obtained by the Confirmation Date, B&B Quality Food Providers' Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to B&B Quality Food Providers' Disputed Secured Claim and may resolve said claim pursuant to the Plan. |
| **Class 8 Claims (Wei Chan DDS)** | Wei Chan DDS' Disputed Secured Claim shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of Wei Chan DDS' Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to Wei Chan DDS on account of its Disputed Secured Claim and the disputed Lien of Wei Chan DDS on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.8(a) has not been obtained by the Confirmation Date, Wei Chan DDS' Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to Wei Chan DDS's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |

| Class | Treatment |
|---|---|
| **Class 9 Claims (Idaho Avenue Land Company)** | The Disputed Secured Claim of Idaho Avenue Land Company shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of Idaho Avenue Land Company's Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to Idaho Avenue Land Company on account of its Disputed Secured Claim and the disputed Lien of Idaho Avenue Land Company on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.9(a) has not been obtained by the Confirmation Date, Idaho Avenue Land Company's Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to Idaho Avenue Land Company's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |
| **Class 10 Claims (USA Petroleum Corporation)** | The Disputed Secured Claim of USA Petroleum Corporation shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of USA Petroleum Corporation's Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to USA Petroleum Corporation on account of its Disputed Secured Claim and the disputed Lien of USA Petroleum Corporation on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.10(a) has not been obtained by the Confirmation Date, USA Petroleum Corporation's Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing.  Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to USA Petroleum Corporation's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |

DISCLOSURE STATEMENT ACCOMPANYING DEBTOR'S PLAN OF LIQUIDATION (DATED: APRIL 16, 2013)

| Class | Treatment |
|---|---|
| **Class 11 Claims (GFC LLC)** | The Disputed Secured Claim of GFC LLC shall receive one of the following two alternate treatments: (a) If the Debtor has obtained an Order prior to the Confirmation Date estimating or determining the amount of GFC LLC's Disputed Secured Claim at zero ($-0-) for Plan Confirmation purposes, no further distributions shall be made to GFC LLC on account of its Disputed Secured Claim and the disputed Lien of GFC LLC on any Estate Assets shall be deemed invalid, void and expunged from the all the Estate Assets on the Effective Date. Or, (b) If an Order referenced in Article 4.11(a) has not been obtained by the Confirmation Date, GFC LLC's Disputed Secured Claim shall be secured after the Effective Date by a Disputed Secured Creditors' Post-Effective Date Lien and shall be paid from the proceeds of the $3.5M Creditor Note on the later of (i) when its Disputed Secured Claim becomes an Allowed Secured Claim and (ii) ninety (90) days after the $3.5M Creditor Note Payment Date. Interest shall also be paid concurrently in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing. Unless objected to or resolved prior to the Confirmation Date, the Plan Administrator shall object to USA Petroleum Corporation's Disputed Secured Claim and may resolve said claim pursuant to the Plan. |
| **Class 12 Claim (Richard Zacky)** | The Richard Zacky Trust's Disputed Secured Claim shall remain secured by the Lien of Richard Zacky Trust until such time as said claim is either Allowed or disallowed.  The Committee disputes the Lien of Richard Zacky Trust, and such dispute shall be resolved prior to or after the Effective Date.  To the extent it becomes an Allowed Claim, the Class 12 Claim shall be paid as soon as practicable from the proceeds of the $3.5M Creditor Note on the later of (a) when the Richard Zacky Trust's Disputed Secured Claim becomes an Allowed Secured Claim, or (b) ninety (90) days after the $3.5M Creditor Note Payment Date (collectively (a-b) above, the "Richard Zacky Trust Payment Date". To the extent allowed, interest shall be also be paid through the Richard Zacky Trust Payment Date in accordance with the underlying loan documents or at such other rate as determined by the Court at the Confirmation Hearing on the Richard Zacky Payment Date.  The Plan Administrator shall have standing on the Effective Date to litigate or settle or otherwise resolve any and all disputes regarding the Class 12 Creditor's Disputed Secured Claim in accordance with the Plan. |
| **Class 13 Claims (Assumed Secured Debt)** | Class 13 consists of Creditors whose secured claims remain on the assets transferred to the DIP Lender pursuant to the Zacky Farms Sale documents and sections 1.1(mm) and 2.1 of the DIP Lender APA and shall be satisfied by the DIP Lender.  No distributions shall be made to Class 13 Creditors under the Plan. Satisfaction of a Claim secured by a Permitted Lien by the Debtor or the Plan Administrator shall not relieve the DIP Lender or its assignee from their respective obligations with respect to such claim and the Debtor shall be subrogated to the rights of any such Claimant against any party, including but not limited to the DIP Lender or its assignee. |
| **Class 14 Claims (Allowed and Settled 503(b)(9) Claims)** | 503(b)(9) Claims became Settled 503(b)(9) Claims by a Claimant's executing and returning the 503(b)(9) Settlement Election on or prior to April 8, 2013, or as later allowed by the Debtor. All Allowed Settled 503(b)(9) Claims shall be paid from the proceeds of the 503(b)(9) Note.  Such payment shall be made on or as soon as practicable after August 26, 2013.  For purposes of clarity, and without further order of the Bankruptcy Court or filing of any other claim, a holder of Settled 503(b)(9) Claim may file a general unsecured claim for the difference between the holder's Settled 503(b)(9) Claim and its 503(b)(9) Claim on or before the Confirmation Date and such amount shall share in Class 15 distributions. |

| Class | Treatment |
|---|---|
| **Class 15 Claims (General Unsecured Creditors)** | The Allowed Claims of the general unsecured creditors shall be paid from Estate Assets to the extent Net Available Cash exists after the payment of or reserve for all senior claims under the Bankruptcy Code Distribution Priorities in accordance with the provisions of this Plan.  Prior to the use of any proceeds from the $3.5M Creditor Note to pay senior obligations under the Bankruptcy Code Distribution Priorities, the Plan Administrator shall obtain Post-Confirmation Committee or Court approval pursuant to the provisions of Article 6.19. All payments shall be made on any principal amounts due, and then on interest, if applicable, at the rate of 7% per annum compounded annually. |
| **Class 16 Interests (Debtor's Members)** | The Debtor's Members shall retain their Interests Post-Confirmation, but the Operating Agreement shall be deemed amended to eliminate any power or right to effect management of the Debtor Post-Confirmation, except to the extent authorized pursuant to other provisions in this Plan.  No Member or group of Members shall have any authority to perform any act on behalf of the Debtor, except to the extent authorized pursuant to other provisions in this Plan.  No distributions to the Debtor's Members shall be made until all Allowed Claims and/or obligations to the Claimants' in Classes 1-15 are fully satisfied. |

### B.    Anticipated Distributions by Plan Administrator

The Plan provides that the Plan Administrator shall reserve the amount necessary to pay senior obligations under the Bankruptcy Code Distribution Priorities. The Plan provides that if the Plan Administrator holds Net Available Cash in excess of what is owed to pay senior obligations, the Plan Administrator shall make interim distributions on account of the general Allowed Unsecured Claims in Class 15 unless such interim distribution would not be economic in light of the amount to be distributed and the cost of such distribution.

The Debtor does not believe that there will be any distributions to Classes 1-13 because the Claims in such classes have either already been resolved during the Bankruptcy Case, or are subject to dispute and litigation, which if successful would eliminate any distributions to such Creditors, or if not successful, would receive Allowed Claims that would receive distributions at the same time as the anticipated distribution to the Class 15 Creditors detailed below.

It is anticipated that the Plan Administrator will collect the $6.4M 503(b)(9) Note on or about August 26, 2013, the date such note is due and payable, and that the Plan Administrator will make a distribution and pay the Allowed and Settled 503(b)(9) Claim amounts in Claim 14 as soon as practicable after that date.

It is anticipated that the Plan Administrator will collect the $3.5M Creditor Note on or about February 26, 2015, and that the Plan Administrator will make a Pro-Rata distribution to

Class 15 Allowed General Unsecured Creditors as soon as practicable after that date.

No distributions to Class 16 Interest Holders is anticipated.

## C. **Miscellaneous Plan Provisions**

The Plan provides that the Plan Administrator shall have such powers after confirmation of the Plan similar to what a pre-confirmation debtor in possession or trustee would have. The Plan provides that Mr. Hank Spacone shall automatically be appointed the Plan Administrator on the Effective Date unless the Court changes the date of appointment in the Confirmation Order. Mr. Spacone is a panel Chapter 7 Trustee for the Eastern District of California, Sacramento Division. He has also served as a Chapter 11 Trustee in multiple complicated liquidation cases and has been a plan administrator or liquidating trustee under confirmed Chapter 11 plans. His resume is attached as Exhibit 5 to the Plan.

The Plan Administrator is to be compensated at the rate of $300 per hour, but shall be capped in compensation pursuant to the Plan Administrator Cap, which is similar to the cap in compensation contained in section 326 of the Bankruptcy Code.

The Committee shall continue to function and operate, but shall be reformulated as a Post-Confirmation Committee, with its existence duties and rights detailed in the Plan.

The Committee and/or the Plan Administrator may retain Post-Confirmation Professionals, but the compensation for payment of such professionals shall be paid is limited in multiple sections of the Plan. For example the Plan details the mechanism for (1) for litigation and claims objection work, all such work must be conducted on a contingency fee arrangement with the contingent fee to be capped at three times the hourly rates charged; (2) for hourly rate employment, such fees are subject to the Post-Confirmation Budget, which is attached as Exhibit 6 to the Plan. Amounts sought above the Post-Confirmation Budget must be approved by the Post-Confirmation Committee or the Court.

The intent of the provisions respecting limitations on Post-Confirmation Professional and Plan Administrator compensation seek to create the best incentives possible to maximize the return to the general Unsecured Creditors from both a real percentage distribution return basis, but also from a time value of money perspective. These incentives are crucial especially in light

of the limited pool of assets available for distribution to the Unsecured Creditors in Class 15.

The Plan does provide that these limitations on Post-Confirmation Professional compensation may be modified due to unforeseen circumstances, and upon the occurrence of which, the Court has the discretion to approve reasonable adjustments as necessary to carry out the purpose and intent of the Plan.

The Plan establishes various deadlines and bar dates including the Administrative Claim Bar Date, described above, as well as a bar date by which any party holding a Claim as a result of rejection of an executory contract must file a proof of Claim within 30 days after the Effective Date, or such Claims shall be disallowed without the need for objection. The Plan also restricts the ability of any Creditor to file a motion seeking to allow the filing of a late filed claim after the Effective Date, and prohibits Creditors from amending Claims after the Effective Date.

The Plan provides for the Bankruptcy Court to retain comprehensive jurisdiction over the Estate Assets equal with the jurisdiction the Court had over the Estate Assets before confirmation of the Plan.

The Plan provides that the Plan Administrator shall exercise his business judgment for the benefit of the Creditors of the Liquidating Debtor in order to maximize the value of the Estate Assets and distributions, giving due regard to the cost, risk, and delay of any course of action.

The Plan also provides that (1) that the Plan Administrator is not required to deliver a payment to a holder of an Allowed Claim if the amount of cash due is less than $500.00 as a result of an interim distribution, or $50.00 as a result of a final distribution. In the case of disputed Claims, unless the Court orders otherwise for cause shown, reserves from each distribution shall be set aside for the holder of each of disputed Claim in an amount equal to what each disputed Claim holder would have received had its Claim or Interest been allowed at the time of the distribution, until the dispute is resolved.

The Plan Administrator may destroy all books and records of the Estate determined by the Plan Administrator in his or her discretion to be unnecessary to completing the administration of the Estate under the Plan, and/or abandon assets.

The treatment afforded each party in Interest under the Plan shall be in full exchange for,

and in complete satisfaction, discharge and release of all Claims and Interests of any kind or nature arising or accruing prior to the Effective Date.

The Plan includes numerous provisions regarding the Plan Administrator's exercise of his powers in the ordinary course of business Post-Confirmation. Creditors are advised to carefully review the Plan and especially Article 6, the Means for Implementation of the Plan.

The Plan provides for a limitation of liability of the Plan Administrator and his or her attorneys, accountants, consultants, employees, agents and assignees, heirs, successors, and assigns, who shall have no liability for any error of judgment made in good faith other than as a result of gross negligence or willful misconduct.

The Plan also provides for a limitation of liability for the Sole Member, the CRO, the Senior VP of Restructuring, and the Committee Members as well as Professionals (after their respective final fee applications are approved) for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case.

Multiple provisions of the Plan deal with distributions of Cash to Creditors.

The Plan also restates the Bankruptcy Codes requirement that Creditors file changes of addresses, or reserves  or they shall run the risk that their Claims may be disallowed, and any returned funds may either be redistributed to other Creditors, or designated as unclaimed funds to be either lodged with the Court or donated to charity upon entry of the final decree.

The Plan provides that confirmation will not discharge the Debtor, but does grant an injunction against all Creditors for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any Claim or demand against the Debtor or the Liquidating Debtor.

The Plan also conveys standing upon and vests jurisdiction and responsibility with the Plan Administrator to collect the Secured Sale Notes and to pursue other Estate Assets, including any affirmative claims or objections to claims, including but not limited to any such claims or objections to claims to recover any remaining accounts receivable, avoidance actions and/or potential affirmative claims against the Richard and Sharon Zacky Entities.

It is important to read the Plan as this Disclosure Statement only summarizes the many

provisions in the Plan.

## VI.

## LIQUIDATION ANALYSIS

As the Plan is a liquidation plan, the Proponent is of the opinion it is unnecessary to prepare an additional analysis of the result that should occur through a liquidation under Chapter 7 of the Bankruptcy Code. The Plan functionally provides the Creditors with the same protections as would be granted in a Chapter 7 and at an anticipated reduced cost. The Plan Administrator is or has been a Chapter 7 and Chapter 11 Trustee in the Eastern District of California. Any Successor Plan Administrator must also meet those criteria under the Plan. The Plan Administrator may also retain the existing Professionals with knowledge of the Case and its issues, including both the Committee Professionals and the Debtor's Professionals, which will significantly reduce the learning curve for the Plan Administrator's professionals.

The Plan Administrator may enter into transactions outside the ordinary course of business that would otherwise require Court supervision, again reducing the costs of administration.

In addition, in conversion to Chapter 7, a new Claims bar dates would be set, permitting the filing of timely Claims by Creditors whose Claims may be time barred under the Plan, and which may significantly increase the costs of a claims reconciliation process. Even if no Creditors file otherwise time barred Claims upon a conversion to Chapter 7, some Creditors will file second or third Claims in the Chapter 7 case.

Further, it is extremely rare for a Chapter 7 trustee to make interim distributions to Creditors, meaning that unsecured Creditors will receive no distributions in a Chapter 7 until the case is fully administered and ready to be closed, which would likely be much longer than it will take for Creditors to receive at least a partial interim distribution under the Plan.

Finally, the compensation allowed to both the Plan Administrator and Post-Confirmation Professionals is more restrictive in many ways than the compensation that might be allowed in a Chapter 7 case. In Chapter 7, the Trustee can assert that he or she is entitled to a commission on all distributions to Creditors under the plan up to the Trustee cap under section 326 of the

Bankruptcy Code.  Under the Plan, the Plan Administrator does not receive a commission, but is subject to a Plan Administrator Compensation Cap, which is calculated almost identically to the Chapter 7 Trustee cap, but the Plan Administrator Compensation Cap only gives the Plan Administrator credit for distributions to certain and not all Creditors.

Accordingly, the Proponent believes that the Plan provides for a greater and significantly more expeditious administration of this Chapter 11 Case, will result in a higher percentage return to the Allowed Claims of the Class 15 general Unsecured Creditors, and will allow for a more prompt completion of this case in a manner consistent with the desires of Creditors and parties in interest.

## VII.

## PROJECTED RECOVERY UNDER PLAN OF LIQUIDATION

Given the uncertainly of the outcome of the expected efforts to disallow certain Claims and the range of possible recoveries from the contemplated litigation against the Richard and Sharon Zacky Entities, it is impossible to predict with any precision the recovery for general unsecured Creditors in this case.

Based on all of the information at its disposal, and based on the assumptions described in this Disclosure Statement, the Proponent presently projects that if the Plan is confirmed and no substantial deficiency Claims are allowed, the likely range of recovery on non-subordinated, allowed unsecured Claims in Class 15 is between 5% to 10% (based on an assumption that the claims against the Richard and Sharon Zacky Entities are not successful), and a range of 18% to 24%% (if the claims against the Richard and Sharon Zacky Entities and the Claims objection process are successful).

Based on all of the information at its disposal, and based on the assumptions described in this Disclosure Statement the Proponent projects that distribution in full for allowed Claims in Class 14 (503(b)(9) Claims) will be made in September 2013.

Based on all of the information at its disposal, and based on the assumptions described in this Disclosure Statement, the Proponent anticipates that Pro-Rata distribution to Class 15 (General Unsecured Creditors) will likely be made in April or May 2015.  This projected

distribution date could occur much sooner if the DIP Lender obtains financing to take out the Secured Sale Notes, but may also be delayed if the DIP Lender is unable to pay the Secured Sale Notes when due and the Plan Administrator is forced to resort to collection actions.

Based on all of the information at its disposal, and based on the assumptions described in this Disclosure Statement, the Proponent projects that no distribution will be made to Class 16 (Interest Holders) or to Creditors holding Classes 1-13 Claims as such Claims are either disputed or resolved as part of the Zacky Farms Sale or the DIP Lender Settlement.

The Richard Zacky Entities assert in an objection filed to the original Disclosure Statement that the unsecured creditors face significant risks that the Debtor will not meet the projections and that there will be no distributions to general unsecured creditors. The Debtor agrees that risks exist such as delays that may be caused if the purchaser fails to timely pay on the Secured Sale Notes, and a foreclosure of such notes must be initiated by the Plan Administrator. Additionally, there is a risk that the estimated administrative and/or priority claims will not be paid in full and the Plan Administrator will need to pursue all remedies that the Debtor possesses to enforce the provisions of the DIP Lender Settlement in order to compel payments due the Estate.

There is also the possibility that the Debtor could exceed the estimates, especially if the Committee's counsel is able to obtain affirmative recoveries against the Richard and Sharon Zacky Entities, or if significant claims objections reduce the total claims.

## VIII.

## FEDERAL INCOME TAX CONSEQUENCES

Because of the assumption of the Debtor's tax obligations up to $500,000 by the DIP Lender as part of the DIP Lender Settlement, the Debtor has not specifically analyzed the tax impact of the Plan on any Creditors or Interest Holders.  For such advice, Creditors and Interest Holders are strongly encouraged to contact their own tax professionals. The Debtor has not incurred the expense of hiring an accountant to analyze the tax attributes of the Debtor and does not believe that the cost is warranted or should be borne by the estate. This summary is for general information purposes only, and does not constitute legal or tax advice.

**IX.**

**ABSOLUTE PRIORITY RULE AND CRAM DOWN**

The Debtor has crafted this Plan to follow the Bankruptcy Code Distribution Priorities. As such, the Debtor believes that the Plan does not violate the "absolute priority rule" and if a class of creditors does not vote to accept the Plan, it may be "crammed down" and confirmed notwithstanding such rejection.

**X.**

**CONCLUSION**

You are urged to carefully read the contents of the Disclosure Statement and Plan and make further inquiries as you may deem appropriate before making a decision to accept or reject the Plan.

The Proponent believes the contents of the Disclosure Statement to be accurate and complete and that the Plan, and by providing for a maximum return to Creditors through an orderly prudent and cost effective liquidation and distribution process through a Liquidating Debtor, justifies your support and a vote to accept the Plan.

Dated: April 16, 2013    ZACKY FARMS, LLC

            _____
            KEITH COOPER
            Its Sole Manager and CRO

Dated: April 16, 2013    FELDERSTEIN FITZGERALD
            WILLOUGHBY & PASCUZZI LLP

            */s/ Thomas A. Willoughby*
            THOMAS A. WILLOUGHBY
            Attorneys for Zacky Farms, LLC